## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

In re:

SRC Holding Corporation, f/k/a                    Bankruptcy Nos. 02-40284,
Miller & Schroeder, Inc., and its                        02-40285, 02-40286
subsidiaries,

          Debtors.

---

Bremer Business Finance                           Civil No. 06-3962 (DWF/AJB)
Corporation, et al.,

          Plaintiffs,

v.                                                        **MEMORANDUM**
                                                   **OPINION AND ORDER**
Dorsey & Whitney, LLP,

          Defendant.
_____

Brian F. Leonard, et al.,                         Civil No. 06-4296 (DWF/AJB)

          Plaintiffs,

v.

Dorsey & Whitney, LLP,

          Defendant.
_____

Bremer Business Finance Corporation,              Civil No. 06-4297 (DWF/AJB)

          Plaintiff,

v.

Dorsey & Whitney, LLP,

          Defendant.

Paul L. Ratelle, Esq., Fabyanske Westra Hart & Thomson, PA, counsel for Plaintiff Bremer Business Finance Corporation.

Chad A. Kelsch, Esq., Edward W. Gale, Esq., Matthew R. Burton, Esq., and Thomas C. Atmore, Esq., Leonard O'Brien Spencer Gale & Sayre, Ltd., counsel for Plaintiffs Brian F. Leonard, et al.

Richard G. Mark, Esq., Mark G. Schroeder, Esq., and Jason R. Asmus, Esq., Briggs & Morgan, PA, counsel for Defendant Dorsey & Whitney, LLP.

## INTRODUCTION

The above-entitled matter came before the undersigned United States District Judge on February 7, 2007, pursuant to the objections and appeal by Defendant Dorsey & Whitney, LLP ("Dorsey") from the United States Bankruptcy Court Judge's Amendment to Findings of Fact, Conclusions of Law and Order for Judgment with Respect to Non-Core Proceedings as to Which the Parties Have Consented to the Entry of Judgment and Report and Recommendation with Respect to Non-Core Proceedings as to Which the Parties Have Not Consented to Entry of Judgment, dated August 30, 2006, in the proceeding captioned *In Re: SRC Holding Corporation, f/k/a Miller & Schroeder, Inc., and its subsidiaries*, Adv. Nos. 02-40284, 02-40285, 02-40286.[1]  Dorsey asks this Court to reverse the Order and to reject the bankruptcy court's findings of fact and conclusions of law.  For the reasons stated herein, the Court accepts in part, rejects in part, and adopts the bankruptcy court's conclusions to the extent they are not inconsistent with this

---

[1]  The bankruptcy court issued its Order and Report and Recommendation on August 28, 2006, which was thereafter amended on August 30, 3006.

opinion and modifies them as explained below.  Specifically, Dorsey's appeal from the

Order is affirmed in part as modified, and reversed in part, and the bankruptcy court's

Report and Recommendation is accepted in part, rejected in part, and adopted as

modified.

## BACKGROUND

### I.     Overview

In February 1999, Miller & Schroeder, an investment-banking firm, closed and

funded two loans (the "St. Regis I" and the "St. Regis II," respectively) to President R.C.

- St. Regis Management Company ("President"), a New York general partnership, for the

construction of a new casino owned by the St. Regis Mohawk Tribe (the "Tribe").  Miller

& Schroeder retained Dorsey to document the loans.  Prior to closing, Miller &

Schroeder, as placement agent for President, received commitments from certain banks to

fund the two loans.  One of these banks was Bremer Business Finance Corporation

("Bremer").

Before closing, Dorsey questioned internally whether a certain document, the

Notice and Acknowledgement of Pledge (the "Pledge Agreement"), required National

Indian Gaming Commission ("NIGC") approval.[2]  Dorsey did not disclose to Miller &

---

[2]     In 1988, Congress enacted the Indian Gaming Regulatory Act ("IGRA") "to
provide a statutory basis for the regulation of gaming by an Indian tribe adequate to
shield it from organized crime and other corrupting influences" and "a statutory basis for
the operation of gaming by an Indian tribe as a means of promoting economic
development, self-sufficiency, and strong tribal governments."  25 U.S.C. § 2702.  The
IGRA established the NIGC to promulgate regulations necessary to implement the IGRA
and to oversee various aspects of the Indian gaming industry.  25 U.S.C. § 2704.

(Footnote Continued on Next Page)

Schroeder that it was having these internal conversations, nor did it advise Miller & Schroeder that it should wait for either NIGC approval of the Pledge Agreement or a letter explaining that such approval was not needed before continuing with the closing. Although Dorsey contends that it took the position that NIGC approval was not required for the Pledge Agreement, both before and after closing several Dorsey attorneys acted as though such approval was needed.

After closing, Miller & Schroeder executed and acted as servicer under participation agreements with the bank lender/participants (the "Participation Agreements") and received the funding from those banks for the full amount of the two loans. Miller & Schroeder forwarded this funding on to President per its obligation under the loan agreement that it and President signed at closing (the "Loan Agreement").

Soon after the casino's opening, President defaulted on its repayment obligations. Pursuant to the Participation Agreements between Miller & Schroeder and the bank lender/participants, Miller & Schroeder retained Dorsey to pursue collection in a lawsuit against President (the "President Litigation"). Dorsey's representation was for the benefit

---

(Footnote Continued From Previous Page)

The NIGC reviews and approves casino management contracts between Indian tribes and contractors. In addition, the IGRA and the regulations require the NIGC to review and approve: (1) certain types of collateral agreements; (2) assignments of rights under a management contract; and (3) modifications of management contracts. *See* 25 U.S.C. § 2711; 25 C.F.R. §§ 533, 535. Agreements requiring approval that are not properly approved are void. *See* 25 C.F.R. § 533.7.

of both Miller & Schroeder and the bank lender/participants,[3] including Bremer, a regional bank based in St. Paul, Minnesota, who had loaned $2 million for the St. Regis II loan.  During Miller & Schroeder's lawsuit against President, Bremer, by and through Ernest ("Bud") Jensen, its Chief Credit Officer, participated in several meetings and phone conferences with both Miller & Schroeder and Dorsey, some of which addressed case strategy.  At no time during these meetings or conferences did Dorsey tell Bremer that it did not represent Bremer.[4]  Nor did Dorsey ever recommend to Bremer that Bremer should retain its own independent attorney to represent its interests.  At one of the meetings in which the Tribe was present, the Tribe indicated for the first time that it believed the Pledge Agreement was unenforceable against the Tribe because the Pledge Agreement lacked NIGC approval.  In response, Dorsey stated that it believed NIGC approval was unnecessary.

Two months after the commencement of the President Litigation, Bremer filed suit against Miller & Schroeder for fraud and misrepresentation regarding the NIGC approval (the "Bremer Litigation").  Miller & Schroeder retained Dorsey again, this time in its defense against Bremer, who was currently one of Dorsey's clients in the President

---

[3]     At issue in this appeal is whether Dorsey's representation extended to Bremer. The Court's conclusion as to Dorsey's representation in the President Litigation is discussed further in the Report and Recommendation Memorandum below.

[4]     Also at no time during these meetings or conferences did Miller & Schroeder tell Bremer that Dorsey did not represent Bremer.

Litigation.[5]  Dorsey did not discuss the possible conflict of interest with either Miller &

Schroeder or Bremer.  Nor did Dorsey discuss the possibility that Miller & Schroeder

may be able to file a third-party malpractice claim against Dorsey for Dorsey's advice or

lack thereof regarding NIGC approval prior to closing.  During the course of the Bremer

Litigation, Miller & Schroeder filed for bankruptcy;[6] thereafter the Bremer Litigation

was stayed.

After the bankruptcy filing, Brian F. Leonard, the appointed Bankruptcy Trustee

for Miller & Schroeder (the "Trustee"), and Marshall Investments Corporation

("Marshall"), the successor to Miller & Schroeder as servicer of the loans,[7] and

separately Bremer, filed suit against Dorsey in Federal Bankruptcy Court.  The matters

were consolidated and they proceeded to trial.  Dorsey now appeals the bankruptcy

court's decision.

---

[5]     While Dorsey contends that Bremer was not Dorsey's client during the President
Litigation, the Court finds that it was.  And at a minimum, Dorsey was aware that it was
likely going to be accused of representing Bremer, which would then raise a conflict of
interest.

[6]     Miller & Schroeder is now called SRC Holding Corporation.  For consistency, the
Court refers to the entity as Miller & Schroeder throughout this opinion.

[7]     Miller & Schroeder appointed Marshall as its agent to service the loans under the
Participation Agreements on August 31, 2001.

## II.    Loan Agreements and Closing

On November 7, 1997, President and the Tribe executed a Fourth Amended and

Restated Management Agreement (the "Management Agreement").  (App. 491-529.) [8]

Under this agreement, President agreed to provide the capital ($20 million) for the

construction of a casino, and then manage the casino upon its opening.  (App. 501-04 at

§§ 5 and 6.)  The Tribe agreed to repay President from the Tribe's share of "net

revenues" and non-gaming related net revenues from any gaming enterprise within the

Tribe's jurisdiction, and conditioned the repayment on President's expenses being

properly documented and verified.  (App. 518-20, 526 at ¶¶ 8.9, 8.10, 10.7.)  On

December 26, 1997, the NIGC approved this agreement.  (App. 530-31.)

Then, under placement agreements/engagement letters dated November 16, 1998,

and February 3, 1999, President (as borrower) hired Miller & Schroeder as its placement

agent, whereby Miller & Schroeder was to "provide financial structuring and loan

placement services for [the St. Regis I and II loans]."  (BA 1, 11.)  These agreements also

provided that Miller & Schroeder would close and fund the loan "at the time the

Placement Agent satisfactorily completes all due diligence associated with the

underwriting of the [loan]" and when it "has received signed 'Commitments to

Participate' letters from all other Senior Loan Participants for purchase of 100% of the

---

[8]    The Court references the appendices that have been filed in this manner in the
following way:  Dorsey's appendix is referred to as "App.," the Trustee and Marshall's
appendix is referred to as "TA," Bremer's appendix is referred to as "BA," and the Joint
Supplemental Appendix is referred to as "JSA."

[loan]."  (BA 6, 16.)  In addition, the agreements provided certain conditions precedent to closing, one of which was "Verification of receipt of approval of the Management Agreement from the NIGC, the State of New York, and/or any other regulatory approvals required to operate the Project."  (BA 5, 15.)

After executing the placement agreements, Miller & Schroeder retained Dorsey[9] to draft the necessary loan documents for the two loans that were to be made to President for $8,624,000 (St. Regis I) and $3,492,000 (St. Regis II) to finance a portion of the construction costs.[10]  These documents included the Loan Agreement between President and Miller & Schroeder (App. 538-79), the Escrow Agreement (App. 586-93), the Promissory Note (App. 580-85), and the Pledge Agreement (App. 594-96).  Paula Rindels, a partner at Dorsey in the business group, billed approximately 90% of the time

---

[9]     Dorsey and Miller & Schroeder did not execute a retainer agreement.  Instead, Miller & Schroeder chose to retain Dorsey as regulatory counsel for its expertise in Indian Gaming Law and based on the fact that they had worked together approximately 35 times before.  However, Dorsey concedes that it had never structured a loan transaction like this, where the borrower was a management company outside the Tribe and the Tribe had the obligation to repay the loan amounts, and that Dorsey did not inform Miller & Schroeder that this was the first of its kind for Dorsey to work on.  Nor did Miller & Schroeder alert Dorsey or any of the bank lender/participants that this was the first transaction of its kind that Miller & Schroeder had had Dorsey involved in.

[10]     Miller & Schroeder prepared salient data sheets for the two loans, which were short descriptive documents that were intended to be sent to the bank lender/participants.  These salient data sheets were provided to Dorsey to help it in documenting the loans.  The salient data sheet for St. Regis I did not state that NIGC approval would be obtained as a condition of closing.  The salient data sheet for St. Regis II stated, "the Tribe and the Manager amended the Agreement to increase the Development Fees to approximately $28,000,000 and have submitted the amendment to the National Indian Gaming Commission ("NIGC") for approval.  NIGC approval is a requirement to funding the Senior Lien [St. Regis I] and Subordinated Senior Lien Financings [St. Regis II]."  (BA 68.)

to this file and was the attorney primarily involved in drafting these loan documents and in advising Miller & Schroeder.  Rindels had worked on several Miller & Schroeder tribal loans previously; however, she had no expertise in tribal regulatory issues, including no knowledge of the NIGC regulations.  Other Dorsey attorneys involved were Mark Jarboe, who was head of the Indian Law Department and the partner in charge of the file, and Chris Karns, who was formerly an employee at the Bureau of Indian Affairs and had approximately five-years experience in Indian gaming law.

The loan documents named Miller & Schroeder as "lender" in the transaction (App. 543, 580, 586, 641, 644), and provided that President was obligated to repay the loans.  (*See e.g.*, App. 594.)  As security, President gave Miller & Schroeder a security interest in the Tribe's payments from its revenue[11] to President.  (App. 594.)  To facilitate this repayment plan, Dorsey drafted the Escrow Agreement whereby an escrow agent was to receive the payments from the Tribe that were due to President and was to distribute payments first to the bank lender/participants for the amounts due, and thereafter, once those were paid, to distribute the remaining funds to President.  (App. 586-92.)

On February 12, 1999, the Tribe, President, and Miller & Schroeder executed the Pledge Agreement.  (App. 594-96.)  Under the Pledge Agreement, the Tribe acknowledged the Loan Agreement between President and Miller & Schroeder and President's pledge that Miller & Schroeder had all rights to the payments that the Tribe

---

[11]     At this time the revenue had not been limited, but instead could come from the Tribe's share of "net revenues" and non-gaming related net revenues from *any* gaming enterprise within the Tribe's jurisdiction.  (App. 526 at ¶ 10.7.)

owed President under the Management Agreement and that these rights were security for repayment of the loans due to Miller & Schroeder. (App. 594-95.) The Tribe also agreed to make repayments into the escrow account that was created through the Escrow Agreement. (*Id.*) In addition, the Tribe agreed that it would "pay all Repayment Amounts due to [President] to the Escrow Account without any set-off or deduction whatsoever notwithstanding any prior termination of the Agreement, or any defense, set-off, counterclaim or recoupment arising out of any claim against [President] or [Miller & Schroeder] . . . ." (App. 595 at ¶ 4.) And, the Tribe agreed "that until the Loan is paid in full, [Miller & Schroeder] shall be entitled to the benefits of and to enforce the agreements of the Tribe under the Agreement relating to the payment of the Repayment Amounts to the same extent as [President]." (App. 595 at ¶ 7.)

Three days after the Pledge Agreement had been signed, Karns researched the NIGC regulations and sent an e-mail to Rindels raising the issue of whether the lender should be subjected to a background check by the NIGC because of the possibility that the loan transaction provided the lender with a financial interest in the Management Agreement. (JSA 1.) Karns also contacted Fred Stuckwisch, the NIGC's Director of Contracts, to determine whether the NIGC wished to review the drafts of the loan documents. Thereafter, in a January 19, 1999 e-mail to Rindels (the "January 19 Karns e-mail"), Karns opined that "the loan agreement must be submitted to NIGC for review," referencing 25 U.S.C. § 2711 and 25 C.F.R. § 533.7. (TA 309.) Karns also explained:

> While it is our understanding that the terms of the loan from [Miller & Schroeder] to the St. Regis Mohawk Casino management company do not contain terms which would grant [Miller & Schroeder] authority to manage

> the Casino, and that the interest granted to [Miller & Schroeder] is merely
> in the development repayment amounts to the manager (as opposed to the
> management fee), NIGC nevertheless needs to review the loan documents
> to ensure that the loan agreement does not provide [Miller & Schroeder]
> with such authority or interest.

(*Id*.)  Karns also reported to Rindels that Stuckwisch "indicated that NIGC merely needs

to review the loan documents to ensure that the loan agreement does not provide for

management of the casino, or an interest in the management fee, as security." (*Id*.)

Because of the imminent closing date, Karns also advised that "this should be done as

soon as possible." (*Id*.)

Rindels responded, acknowledging that the Pledge Agreement was a pledge of the

Management Agreement revenues as security for the loan, which Dorsey had "already

told the manager had to be submitted to NIGC for approval." (TA 310.)  Then on

January 20, 1999, Rindels e-mailed Karns again on the same topic, with carbon copy to

Jarboe:

> During my long meeting/conference call this morning, I noticed the parts
> of your original e-mail below regarding [Miller & Schroeder] not having
> an interest in the management fee. The way this deal is currently
> structured they do have such an interest. Both the amounts paid as
> management fees and the amounts paid as loan repayment amounts secure
> the loan to the manager . . . . Do we still have any chance with NIGC?

(*Id*.)  Karns responded to Rindels, with carbon copy to Jarboe, stating that he did not

"believe NIGC will be concerned by the security in both payments to the escrow account

(mgmt fee and repayment amt)." (*Id*.)  Karns further stated, "I think NIGC will be

comforted by a 'walk through' of the arrangement in a cover letter so that they know

what to look for/expect." (*Id*.)  Thereafter, Dorsey submitted drafts of the Loan

Documents and Pledge Agreement to the NIGC for its "determination and review" as to whether the lender "has a financial interest in or management responsibility with respect to the Management Agreement."  (JSA 2-3.)  The draft of the Loan Agreement submitted to the NIGC conditioned the effectiveness of the agreement upon "*evidence of the approval of the Loan Documents by the National Indian Gaming Commission, or a letter indicating that such approval is not required*." (JSA 34 at ¶ 5.01(b) (emphasis added).)

By January 27, 1999, Dorsey had not yet heard from the NIGC, and Rindels asked Karns whether a phone call regarding the status of the approval could be made.  (TA 314.)  Karns called the NIGC and spoke with Elaine Trimbell, who told him that she had not looked at the documents yet, and that it would take approximately 30-60 days for NIGC to finish its review.  (TA 315.)  When Karns reminded her of the timeline for closing, Trimbell responded, "there is no way we can turn it around that fast."  (*Id.*) Karns then spoke with Virginia Boylan, a partner at Dorsey who headed the Washington Indian Gaming Group with known expertise in matters having to do with the NIGC and IGRA, whereby she indicated that she did not believe that the NIGC's delay with the approval should hold up the closing.  (*Id.*)  Karns then forwarded all of this information on to Rindels, Jarboe, and Boylan.  (*Id.*)

Two days later, Rindels responded, referencing the January 19 Karns e-mail in which Karns quoted 25 C.F.R. § 533.7, which states that "[m]anagement contracts and changes in persons with a financial interest in or management responsibility for a management contract, that have not been approved by the Secretary of the Interior or the

Chairman in accordance with the requirements of this part, are void." (TA 309, 319.)

Rindels then queried:

> Then why would the NIGC not having reviewed the documents not hold up the deal? How can our client be protected? Is there [a] chance that, if for some unforeseen reason the NIGC later says our loan documents do give M&S a financial interest in the management agreement, either or both of the management agreement and the loan documents would be void? Or is that not what that sentence in the regs says?

(TA 319.) Boylan responded to Rindels' concerns stating the following:

> This is a very tough issue – however, I would think we have done enough of these to know what NIGC is looking for (and there are "instructions" from them on this issue) – if there [is] a question, then of course we must wait.

(*Id.*)[12]

Meanwhile, President and the Tribe negotiated a raise in the construction cap. On January 26, 1999, the Tribe and President signed a letter agreement that acknowledged that President's capital restriction would be raised from $20 million to approximately $28 million, and which allowed President to procure a second loan through Miller & Schroeder. (*See* JSA 60.) In return, President agreed to amend § 10.7 of the Management Agreement to limit the Tribe's obligation to pay development costs, after termination for cause, to revenues generated solely at the casino that was under construction, rather than from any gaming enterprise within the Tribe's jurisdiction. On

---

[12]     Dorsey did not forward the above-referenced e-mails to Miller & Schroeder at any time, nor was the fact that Dorsey questioned whether approval was needed discussed with Miller & Schroeder. And, while Rindels and Jarboe both suggest in their testimony that it was Miller & Schroeder that was insisting on NIGC approval, there are no documents in the record that support this; instead, the internal Dorsey e-mails show that it was the Dorsey attorneys who thought that NIGC approval was necessary.

January 29, 1999, the Tribal Council passed Tribal Resolution No. 99-005 consistent with these changes, among others.  (BA 346-49.)  In this Resolution, the Tribe also authorized "the execution of agreement entitled 'Notice and Acknowledgment of Pledge' for the purpose of assisting the Manager in obtaining a loan for the increased Development Expenses as long as it contains or includes the same changes as are contained in this Resolution."  (BA 348.)

Thereafter, President prepared amended versions of the Management and Pledge Agreements and submitted an unsigned Amendment to the Management Agreement to the NIGC for review.  Rindels also sent revised loan documents to Miller & Schroeder for review.  In this draft, Rindels had changed ¶ 5.01(b) so that it now provided that the effectiveness of the agreement was conditioned upon the lender receiving "evidence of approval of the Notice of Pledge by the National Indian Gaming Commission, or a letter indicating that such approval was not required."  (JSA 86 at ¶ 5.01(b); JSA 133 at ¶ 5.01(b).)

On February 12, 1999, the Tribe and President signed the Amendment to the Management Agreement and the amended Pledge Agreement.  (*See* App. 532.)  Four days later, the NIGC sent a letter to President and the Tribe explaining that it may take more than 30 days to review the Amendment documents and reach a decision on approval; the NIGC also raised certain questions regarding the construction of the casino

and requested documents regarding water and environmental issues.[13]  (JSA 175-77.)
President requested that Miller & Schroeder close the loans without receiving a
determination from the NIGC.[14]

---

[13]     Also on February 16, 1999, Bremer committed to fund $2.5 million of the
St. Regis II loan, which was reflected in a confirmation ticket prepared by Miller &
Schroeder.  (BA 219-20.)  This amount was later reduced to $2 million.  (*Id*.)

[14]     Interestingly, the Loan Agreement between President and Miller & Schroeder
indicates that Miller & Schroeder, not President, was in the driver's seat as to when the
agreement would become effective:

> 5.01.  Effectiveness of Agreement.  This Agreement shall become effective
> upon its execution and delivery by the parties hereto and when the Lender
> [Miller & Schroeder] shall have received in form and substance
> satisfactory to it:
>
> > (a)  the Note, Escrow Agreement and the Notice of Pledge duly
> > executed *and approved by the appropriate parties*;
> >
> > .  .  .  .
> >
> > (m)  such other documents, instruments, *approvals or opinions as
> > the Lender [Miller & Schroeder] may reasonably request.*

(App. 556-57 at § 5 (emphasis added).)

Therefore, the Court strains to understand not only why President was pushing to
close on the scheduled date, but more importantly, why Miller & Schroeder—or Dorsey
in its role as Miller & Schroeder's counsel—did not push back to hold up the closing
until either approvals or declination letters were obtained.  Miller & Schroeder had the
right to do so under the Loan Agreement, and Dorsey surely knew of this right, as Dorsey
attorney Rindels is the person who drafted the agreement.

Also, as such, at the time of closing, Miller & Schroeder had loyalties to both
President and to the bank lender/participants, whose interests were not necessarily
aligned.  And through Miller & Schroeder's acquiescence with President's push for
closing, Miller & Schroeder evidenced that its loyalties to President prevailed.

Dorsey asserts that Miller & Schroeder then asked Dorsey whether the Pledge Agreement required NIGC approval to be enforceable against the Tribe. Dorsey asserts that Rindels consulted Jarboe on this issue, and Jarboe concluded that no approval was required. Dorsey contends that Rindels then orally advised Miller & Schroeder (either Steve Erickson, Miller & Schroeder's Senior Vice President and Gaming Finance Manager, or Patti Fredericks, Miller & Schroeder's Supervisor of Sales).[15] But Bremer and the bankruptcy court question whether Dorsey ever communicated that advice.[16] At a minimum, none of these alleged communications were documented.

While Dorsey was documenting the loans and determining whether regulatory approval was necessary, Miller & Schroeder was preparing to market participation interests in the loans. Miller & Schroeder prepared and distributed an Offering Memorandum and a Participation Agreement to interested financial institutions. The Offering Memorandum for St. Regis II contained a salient data sheet that set forth the terms of the loan and identified President as the Borrower and Miller & Schroeder as the borrower's Placement Agent. (BA 67.) It also stated the security for repayment included an assignment by the manager of the management fees due from the Tribe to the Manager

---

[15]     The Court agrees with the bankruptcy court that the scope of Dorsey's retention included advising the lender as to whether the transaction could be closed before all regulatory approval was obtained.

[16]     Jarboe testified that he knew on or before January 21, 1999, that the Pledge Agreement did not need NIGC approval. (Tr. Vol. V at 18-20, 62-63, 153-54.) Jarboe also testified that between January 13, 1999, and February 16,1999, he had billed only 2.5 hours to the file. (Tr. Vol. V at 15.) Jarboe's time entries reflect that he billed 1.5 hours to the file between February 1, 1999, and June 30, 1999. (BA 53-58.)

for operating the casino and an assignment of the development fees due from the Tribe to the Manager for constructing the casino.  (BA 68.)  These assignments were subordinate only to the Manager's obligations to pay St. Regis I.  (*Id*.)  The salient data sheet also stated "NIGC approval is a requirement to funding the Senior Lien [St. Regis I] and Subordinated Senior Lien [St. Regis II] financings."  (*Id*.)  Bremer, along with all of the other bank lender/participants, received the Offering Memorandum.[17]  Bremer also received financial information on President from Miller & Schroeder showing that President was a company with a strong net worth.  (BA 75-76.)

On February 22, 1999, Michael Frank, a member of Miller & Schroeder's sales force, sent a memorandum to the bank lender/participants regarding the status of the loans whereby it stated that the Pledge Agreement "has been submitted to the NIGC for review and the final executed [Pledge] by Miller & Schroeder will be submitted by the Tribe after closing.  A positive response from NIGC is expected to proceed in due course."  (BA 22.)  Miller & Schroeder also stated, "As the Loans are first to be repaid from the revenues as described above, Miller & Schroeder is recommending the participants close and fund as scheduled."  (*Id*.)[18]  There is no evidence in the record indicating that Bremer received this memorandum.

---

[17]    Along with receiving the Offering Memorandum, Jensen testified that someone from Miller & Schroeder told him that Dorsey had been retained as counsel for the lender to complete the documentation of the transaction.  (BA 73-74.)

[18]    This information provided by Frank was taken verbatim from a memorandum that Fredericks had provided the sales force on February 18, 1999.  (*See* JSA 183-84.)

On February 24, 1999, Rindels sent an e-mail to Karns (carbon copying Jarboe) whereby she indicated that she wanted the NIGC review of the Pledge Agreement and other loan documents to proceed:

> 2.  I assume that our request for NIGC review of the Notice of Pledge and other loan documents has not been withdrawn and is still proceeding.  We do want it to proceed, especially for the Notice of Pledge.  Could you find out whether they want us to submit the executed Notice of Pledge in connection with their review? . . . It looks like the loans will probably be funded today.

(TA 321.)  Karns responded that same day reporting on a conversation that he had with Trimble at NIGC:

> She said that the documents are still under review, but that it will likely take a little bit longer than originally anticipated to conduct their review because the Tribe needs to have the amendment to raise the ceiling up above $20M and has asked that the amendment be processed prior to the loan documents being approved . . . .  She does want to see the executed Notice of Pledge.

(TA 322.)  Later that afternoon, Rindels then responded, stating, "I don't think we are particularly concerned at this point - since we've now funded the loans! - with how long it takes.  And we would agree that the amendment to the management agreement is first priority - no problem there.  (TA 323.)

On February 24, 1999,[19] Miller & Schroeder closed and funded the loans.[20]  The signed Loan Agreement at ¶ 5.01(b), which Rindels had drafted and edited, had removed

---

[19]     The bankruptcy court stated that Miller & Schroeder formally closed the two St. Regis loans on February 26, 1999.  While Bremer agrees with the bankruptcy court's finding, citing a time entry by Rindels in support, Dorsey contends that the closing was on February 24, 1999.  The dispute over the closing date does not effect any of the

(Footnote Continued on Next Page)

the prior closing condition of the lender receiving "evidence of approval of the Notice of

Pledge by the [NIGC], or a letter indicating that such approval was not required," and

replaced it with the condition that the borrower provide the lender "a copy of the

resolution of the Tribe authorizing the execution and delivery of the Notice of Pledge."

(App. 556 at ¶ 5.01(b).)  On February 25, 1999, Miller & Schroeder sent wire instructions

for funding to Bremer and the other participants.  (BA 24-52(b).)

After closing, Rindels continued to press the issue of NIGC approval.  On

February 24, 1999, Rindels sent a letter to President listing the following post-closing

items/matters, among others:

> 3.    Copy of fully executed amendment to management contract with
>        evidence of approval of NIGC and any correspondence from NIGC,

---

(Footnote Continued From Previous Page)
Court's determinations herein.  However, the Court notes that the evidence (e.g., the loan
documentation) more likely reflects that the closing date was on February 24, 1999.

[20]    Dorsey contends that there is no evidence that Miller & Schroeder had sold any
participation or received commitments to purchase the participations prior to closing.
Bremer asserts that Miller & Schroeder obtained commitments from Bremer to fund a
portion of the loans prior to closing.  The record reflects that the November 16, 1998, and
February 3, 1999, placement agreements/engagement letters provided that Miller &
Schroeder would close and fund the loan "at the time the Placement Agent satisfactorily
completes all due diligence associated with the underwriting of the [loan]" and when it
"has received signed 'Commitments to Participate' letters from all other Senior Loan
Participants for purchase of 100% of the [loan]."  (BA 6, 16.)  The record also reflects
that Miller & Schroeder prepared a confirmation ticket stating that as of February 16,
1999, Bremer had committed to fund $2.5 million of the St. Regis II loan.  (BA 219-20.)
And, Miller & Schroeder sent a memorandum to the participants just days before closing
stating that it "recommend[ed] the participants close and fund as scheduled."  (BA 22.)
Whether Dorsey or Bremer is right, or both, the issue of when Bremer committed or
bought its participation plays no part in the Court's decision on Bremer's standing.

President R.C. or the Tribe regarding such amendment pending such
approval (from President R.C.).

4.     Copy of NIGC approval of Notice and Acknowledgment of Pledge
or letter indicating that approval is not required (we expect to
receive directly but let us know if you receive anything).

(BA 164.)  Rindels sent a similar letter to President on April 13, 1999.  (BA 169.)  Then,

on April 29, 1999, Fredericks sent another similar letter to President, asking for an update

on the outstanding approval issues.  (BA 171.)[21]

In an April 16, 1999 letter, the NIGC informed President and the Tribe that it

would not be taking action to either approve or disapprove the Amendment within the

regulatory 60-day time frame.[22]  (JSA 185.)  Then later, in a June 18, 1999 letter, Walter

Horn from President responded to Miller & Schroeder's status request on the issue,

explaining that the Amendment had been delayed before the NIGC because of "numerous

---

[21]     The bankruptcy court states that similar requests were made of President "on more
than a dozen occasions thereafter until February 2000[.]"  (App. 130.)  While the Court
has not been able to locate all of the approximate dozen communications, the letters in
the record here do indicate that Dorsey was continuing to act as though NIGC approval
was needed.

In addition, because Rindels was both present at closing and was continuing to
communicate with President post-closing on Miller & Schroeder's behalf, Dorsey's
contention that it only represented Miller & Schroeder for the purposes of drafting the
loan documents, and not for the purposes of giving advice regarding closing, is meritless.

[22]     The effect of NIGC's inaction is effective disapproval of both the Amendment and
the Pledge Agreement.  *See* 25 C.F.R. § 535.1(d)(2) ("If the Chairman does not approve
or disapprove, he shall respond in accordance with the service provisions of part 519 of
this chapter noting that no action has been taken on the proposed modification [or
assignment, under § 535.2].  The request *shall therefore be deemed disapproved* and the
parties shall have thirty (30) days to appeal the decision under part 539 of this chapter.")
(emphasis added).

requests for additional information" and a requirement for a "supplemental environmental assessment," which was to be submitted to the NIGC within the next two weeks.  (BA 174.)  As to the Pledge Agreement, Horn explained that, to his knowledge, "there has been no action by the NIGC[.]"  (*Id.*)

Post-closing, the bank lenders executed Participation Agreements with Miller & Schroeder.  Bremer funded its $2 million participation on April 6, 1999, and executed its Participation Agreement in May 1999 with an effective date of March 1, 1999. [23]  (App. 627-31; 640-60.)

The Participation Agreement between Miller & Schroeder and Bremer defines their relationship as that of buyer and seller.  (App. 645 at ¶ 2.2.)  Miller & Schroeder is also described as loan servicer that generally acts as the participants' agent.  (*Id.*)  As such, Miller & Schroeder was obligated to enforce any remedies under the loan documents in the event of President's default (App. 650-51 at ¶ 6.2), it was empowered to retain counsel to pursue litigation to collect the loans (App. 648 at ¶ 4.8, 650-51 at ¶ 6.2), and it would do so not only on its behalf, but also on behalf of the participants.  (App. 648 at ¶ 4.8.)

Specifically, ¶ 2.2 reads in relevant part as follows:

---

[23]     Bremer's Jensen contends he did not have any conversations with anyone at Dorsey or Miller & Schroeder other than Frank, the Miller & Schroeder sales-force member who sold Bremer its participation, prior to Bremer's participation.  Jensen did not know of the advice that Dorsey had given Miller & Schroeder regarding NIGC approval prior to closing or when it funded its loan.

The Participant hereby approves of and authorizes [Miller & Schroeder] to be named as the nominal payee of the Note and nominal beneficiary of each Guaranty and the nominal secured party under the Loan Documents and, subject to the provision of this Agreement, to generally act as agent for all the Participants in the holding and disposition of the Collateral. [Miller & Schroeder] agrees that [it] holds the security interests and other interests granted by the Note and the Loan Documents not in its individual capacity but rather as an agent for the Participants in accordance with this Agreement.

(App. at 645.)  As to pursuing litigation regarding the loan, ¶ 4.8 reads as follows:

If Lender is of the opinion that the services of an attorney should be retained for the protection of the interests of Lender, Participant, and Other Participant(s), Lender shall select and retain an attorney to represent Lender, Participant, and Other Participant(s).  Participant, and Other Participant(s) shall pay on demand its portion of the fees and expenses of such attorney in proportion to its Participation Percentage of the Loan.

(App. at 648.)  Also, ¶ 6.2.4 of the Participation Agreement reads as follows:

Lender shall, on behalf of itself and all Participants, enforce any remedies under the Loan Documents (herein generally "Enforcement Procedures"), and in furtherance thereof may select counsel and other professionals of its choice to assist Lender on the following terms and conditions:

. . . .

6.2.4.  In the event that Enforcement Procedures are brought and prosecuted by Lender, such proceedings shall be instituted by Lender and counsel of its choice and Lender shall keep Participant informed to the extent of Lender's knowledge as to the progress of the proceedings.  Lender may accept reinstatement or redemption of the Loan without the prior consent of Participant, and Participant acknowledges that the Loan may be reinstated or redeemed by Borrower without the consent of Participant.

(App. 650-51.)

As purchaser in this agreement, Bremer acknowledged that it had "received and

made a complete examination of copies of all Loan Documents it requires to be examined

and approves of the form and content," "made its own credit analysis and decision to

purchase its participation interest in the Loan," was "participating with Lender based

upon [its] own independent examination and evaluation of the Loan transaction and the

information furnished with respect to Borrower and without any representations or

warranties from Lender as to the Borrower's financial suitability, the appropriateness of

the investment and the value and security of the Collateral."  (App. 645-46 at ¶ 3.1.)

Further as to warranties, the agreement states:

> PARTICIPANT ACKNOWLEDGES THAT LENDER MAKES NO
> WARRANTY OR REPRESENTATION AND SHALL NOT BE
> RESPONSIBLE FOR ANY STATEMENT, WARRANTY OR
> REPRESENTATION MADE IN CONNECTION WITH THE
> COLLATERAL OR ANY DOCUMENT IN CONNECTION WITH THE
> LOAN . . . . PARTICIPANT ACKNOWLEDGES THAT LENDER HAS
> MADE NO GUARANTY OF REPAYMENT, IT BEING UNDERSTOOD
> PARTICIPANT SHALL LOOK ONLY TO BORROWER, AND
> OBLIGOR AND TO THE COLLATERAL FOR REPAYMENT OF THE
> LOAN.

(App. 646 at ¶ 3.1; *see also* App. 649 at ¶ 5.2.)  As to the Lender's responsibilities, the

agreement states the following:

> Lender shall not be liable to Participant under any circumstances directly
> or indirectly, for any action taken or omitted to be taken by it in good faith,
> nor shall the Lender be liable or responsible for the consequences of any
> oversight or errors of business judgment made in good faith in the exercise
> of its reasonable judgment.

(App. 649 at ¶ 5.3.) [24]  The Participation Agreement between Miller & Schroeder and

Bremer was a standard form agreement drafted originally by Miller & Schroeder.

---

[24]    While the disclaimers in the Participation Agreement play no part in the Court's
determination as to Bremer's standing, the Court notes that it would have no difficulty
(Footnote Continued on Next Page)

### III.   The President Litigation

The casino opened as scheduled in the second week of April 1999.  Soon

thereafter, President recognized that payments might not be made under the Agreement.

The bank lender/participants agreed to two extension agreements with President, which

pushed the commencement date of principal payments to August 20, 2000.  But the Tribe

continued to have difficulties making money and it also refused to make payment on the

loans claiming that President's expenses were not properly verified.  President then

defaulted in February 2000, when it failed to make the interest payment due.

In April 2000, the Tribe passed a resolution terminating President's Management

Agreement.  On May 8, 2000, Jensen and Erickson met with tribal representatives to

discuss the Tribe's continuing obligation to make payments into the escrow account,

which the Tribe acknowledged.  It was then that Jensen learned for the first time that the

NIGC had never approved the Amendment to the Management Agreement.  When Jensen

inquired of this to Erickson, he said he did not know why it had not been obtained.  (Tr.

Vol. I at 181.)

On May 9, 2000, Miller & Schroeder notified President that it was accelerating the

due date on the St. Regis loans.  And later that month, Miller & Schroeder reported to the

lender bank/participants that the casino's finances were steadily improving.

---

(Footnote Continued From Previous Page)
finding that these disclaimers do not protect Miller & Schroeder from the bank
lender/participants' claims, as the Court seriously questions whether Miller & Schroeder,
acting as a dual agent with conflicting loyalties, acted in good faith or exercised
reasonable judgment.

Throughout May, Jensen was not satisfied with how the negotiations were proceeding between Miller & Schroeder, the bank lender/participants, the Tribe, and President.  After a meeting with people from Miller & Schroeder and Dorsey on the status of the loans, and after Miller & Schroeder suggested that the bank lender/participants attempt to negotiate with the Tribe, Jensen asked Erickson to get Dorsey involved and to make a demand to President and the Tribe foreshadowing a foreclosure action.  On June 13, 2000, Erickson asked Jan Rolbiecki, head of Miller & Schroeder's loan servicing group, to start a memorandum.  He recommended that "[i]t may be best to structure as a legal brief that we can send to our banks so that everyone knows that we have our attorney's involved in the transaction."  (App. 741.)  The matter was then referred to John Thomas, a litigation partner at Dorsey.

On June 28, 2000, Thomas sent a letter to Miller & Schroeder summarizing his qualifications and attaching information about the Dorsey firm.  (App. at 748.)  In this letter, he stated, "I thought it might be useful to you and the loan participants to give you a brief summary of my firm and my background and capability to represent you in these matters."  (*Id*.)  Also attached was a memorandum prepared by Thomas, dated June 29, 2000, outlining the bank lender/participants' legal rights and remedies for collection under the loan documents (the "Thomas Memo").  (App. 743-47.)  The Thomas Memo was addressed to "Miller & Schroeder Investments Corporation Loan Participants" and it was stamped "PRIVILEGED DOCUMENT SUBJECT TO ATTORNEY-CLIENT PRIVILEGE."  (App. at 743.)  The stated purpose of the memorandum was "to outline the terms of the original transaction, describe and evaluate the nature of the collateral

granted to secure the Borrower's obligations, identify sources of repayment, and review

the legal and business options that are presently available."  (App. 743.)  One section of

the memorandum was devoted to "Legal Rights and Remedies of Loan Participants."

(App. 745-47.)  There, Dorsey explains the following:

> [T]he most obvious and direct remedy is a suit against the Borrower for amounts owed on the Loans.  Such a suit could be immediately commenced and a Judgment obtained quickly, however we believe that the Borrower may not have any financial resources to satisfy a Judgment at this time.  Similarly the general partners that constitute the Borrower were single purpose entities that have little or no assets and therefore a Judgment against the general partners of the Borrower would be fruitless also.[25] . . .

> Because the Loan Participants have perfected their interest in the assignment of the Project Revenues the Loan Participants have a right to notify the Tribe directly that all development cost payments are to be remitted directly to the escrow agent for the benefit of the Loan Participants pursuant to the Pledge previously signed. . . .

> As a part of the claim against the Tribe, we would request that the Tribe provide an accounting of all financial records relating to repayment of development costs and any and all funds owed to the Borrower under the Agreement together with all other financial reporting documents that would assist Miller & Schroeder and the Loan Participants in monitoring the status of the Project's net revenues.

(App. 746-47.)  Therein, Dorsey also incorrectly advises that pursuant to § 10.7 of the

Agreement, if the Agreement is terminated for cause, that the Tribe is obligated to make

payments from non-gaming related net revenues from "any gaming enterprise within

[the] Tribe's jurisdiction."  (App. 746-a.)  Section 10.7, however, had been amended

prior to closing, and the Tribe's payments were now limited to revenues generated solely

---

25      Interestingly, this is directly contrary to the information that Miller & Schroeder had sent to the bank lender/participants prior to closing with the Offering Memorandum, indicating that President was a company with a strong net worth.

at the casino that was under construction, rather than from any gaming enterprise within

the Tribe's jurisdiction.  (App. 532.)

In the section entitled "Other Options" Dorsey advised the following:

> In the event that negotiations with either the Borrower or the Tribe do not
> result in a favorable resolution and repayment terms of the Loans, we
> would suggest commencing suit in Federal District Court for the District of
> Minnesota against the Borrower and the Tribe.

(App. 746-a.)  Also in the memorandum, Dorsey stated that the Amendment to the

Management Agreement was supported by the Tribe, "but was not ultimately approved

by the NIGC."  The memo, however, did not mention the status of the Pledge Agreement.

(App. 744.)  The memo also did not mention that Dorsey had questioned the

enforceability of the Pledge Agreement without NIGC approval prior to closing, that

Dorsey acted both before and after closing as though NIGC approval was necessary, or

that Dorsey may have made a mistake by not waiting for a communication from the

NIGC.

Miller & Schroeder then forwarded both the Thomas Memo and the June 28

Thomas letter to the bank lender/participants with a cover letter from Rolbiecki.  This

cover letter included the following comment:

> Lastly, find a summary on the Dorsey & Whitney firm and a background
> summary on our counsel, John C. Thomas, which Miller & Schroeder
> Investments Corporation has retained *to represent the Loan Participants*.

(App. at 743 (emphasis added).)

Dorsey contends that Thomas then advised Rolbiecki that the statement in her

cover letter that Dorsey had been retained to represent the participants was an error, and

that Rolbiecki asked Thomas to correct the misstatement in writing.  On July 12, 2000,

Thomas sent a memorandum to Rolbiecki, which stated the following language that could

be used in her next memorandum to the bank lender/participants:

> To be a bit more precise, under the terms of the Participation Agreement
> between Miller & Schroeder Investment Corporation and the various loan
> participants, the Dorsey & Whitney firm acts as counsel for Miller &
> Schroeder Investment Corporation, as agent.  Dorsey & Whitney will be
> counsel to Miller & Schroeder Investment Corporation in representing its
> interest and the interests of the participants, in all collection, enforcement
> and restructuring matters relating to the St. Regis loans.

(App. 751.)  This language was not forwarded on to the bank lender/participants, nor did

Thomas or anyone else contact any of the bank lender/participants then or at any time to

tell them that Dorsey was not representing them or to recommend that the bank

lender/participants retain separate counsel.

Even after the July 12, 2000 memorandum was sent to Miller & Schroeder, Miller

& Schroeder employees still believed that Dorsey was being retained to represent the

bank lender/participants in any action against President.  At trial, Erickson testified that

the background information about Thomas and Dorsey was sent to the participants to

introduce them to their lawyer:

> Q:      And the reason you sent the third exhibit to the loan participants is
>          because you were introducing them to their lawyer, right, John
>          Thomas and the Dorsey firm that had been retained to help out in
>          this collection matter?
>
> A:      Correct.

(TA 57.)  Erickson also testified that the Rolbiecki cover letter/memo correctly stated the

intent to retain Dorsey as counsel for the bank lender/participants:

Q:      Was it your intent when this memo was sent that Dorsey was or that
        Miller & Schroeder was in fact retaining Dorsey to represent the
        loan participants in the collection suit?

A:      Correct.

(TA 56.)  And further, Erickson testified that Dorsey acted as counsel for the participants

throughout the President litigation:

Q:      A few more questions on the President case and then I'll move on to
        the next one.
                You understand that President case began in October of 2000
        and ended sometime in April or so of 2002.
                Do you generally understand that?

A:      Yes.

Q:      Did Dorsey act as counsel for Miller & Schroeder and the
        participants throughout that entire time period?

A:      Yes.

(TA 61.)[26]

---

[26]    During the cross-examination of Erickson, he testified as follows:

Q:      Now we're in time for the collection action against President.
        Miller & Schroeder was a client of Dorsey in connection with that,
        correct?

A:      Yes.

Q:      Was Bremer a client?

A:      No.

(App. at 375.)  While this testimony appears to be contradictory to that above, the
question asked of Erickson was whether Bremer was a client.  The question is ambiguous
because it is unclear whether Dorsey's counsel was asking whether Bremer was a client
of Dorsey's or whether Bremer was a client of Miller & Schroeder's.

After further meetings between Miller & Schroeder, President, and the Tribe, which did not lead to resolution, Miller & Schroeder drafted a document entitled "Acknowledgement of Lender's Security Interest and Consent of Parties." (BA 253-56.) This document included an acknowledgment from the Tribe of the "assignment and grant of the security interest pursuant to [the Pledge Agreement]." (BA 253.) Thomas, however, advised Rolbiecki against sending it to President or the Tribe, stating:

> [A]fter reviewing the various agreements and acknowledgements that have been given in the financing documents I don't believe this agreement is necessary and *may raise some flags* to the Borrower that are not necessary at this time. As the documents read right now, without further modification or amplification, you have the right to step into the shoes of the Manager and renegotiate the whole amount of the development costs and terms of the loan and not just the amount that corresponds to the two notes. *Putting this document in front of them and asking them to agree to what they already signed serves to bring this whole issue to their attention.* I can easily convince the tribal attorney of this fact and that may bring about a quicker resolution to the development costs issue than the Manager could negotiate so long as we deal with the debt and development costs in good faith with the Tribe.

(BA 252 (emphasis added).) Thereafter, Miller & Schroeder did not ask President or the Tribe to sign the acknowledgment.

In the months of July through September 2000, Miller & Schroeder kept the bank lender/participants advised of developments, including that President had sued the Tribe, and that their counsel, Dorsey, advised them to intervene in the litigation. During this time, Miller & Schroeder advised the Tribe of its intent to intervene and Thomas continued to attempt negotiation with the Tribe and President to no avail. Eventually, after learning that the state court was going to dismiss President's case because the

Tribe's waiver of sovereign immunity was to suit in federal, not state court, Thomas decided not to go forward with the motion to intervene.

On October 3, 2000, Erickson (from Miller & Schroeder), Thomas (from Dorsey), Jenson (from Bremer), and another bank lender/participant representative met with the Tribal Counsel to discuss possible resolution. During the meeting, Chief Terrance of the Tribe stated that since the Pledge Agreement had not been approved by the NIGC, it was unenforceable against the Tribe, and that until or unless NIGC approval was obtained, the Tribe did not have a direct obligation to Miller & Schroeder.[27]  (App. 775.)  This was the first time that the Tribe had disclosed its belief to Dorsey, Miller & Schroeder, and Bremer.  Dorsey, however, did not disclose the internal discussions that it had in 1999 regarding the approval at this time; nor did Dorsey indicate that it had been pursuing NIGC approval both before and after closing as if NIGC approval were necessary.  In addition, Dorsey did not explain whom it was representing at this meeting (i.e., only representing Miller & Schroeder), even though Dorsey had ample opportunity—both in the presence of the Tribe and/or outside the presence of the Tribe.[28]  On that same day,

---

[27]    After this meeting, Thomas asked Rindels and Jarboe whether the Tribe was correct.  They indicated that the Tribe was wrong, and asserted that the Pledge Agreement did not require NIGC approval.  Thereafter, Thomas advised both Miller & Schroeder and the Tribe of Dorsey's view.

[28]    The Court finds it very disconcerting that Thomas did not at this time tell Jensen/Bremer that he was not Bremer's attorney if Dorsey intended to only represent Miller & Schroeder.  The Court can only imagine the parties sitting around a conference table, starting the meeting by giving introductions.  Any prudent attorney in Thomas' shoes would have at that time introduced himself as "Mr. Thomas, here representing Miller & Schroeder," if that is what he believed.  Instead, silence compels the inference

(Footnote Continued on Next Page)

Miller & Schroeder filed its suit in the United States District Court for the District of

Minnesota against President for collection of the unpaid loan amounts and against the

Tribe for an accounting to determine casino revenues.  (App. 763-72.)

On October 6, 2000, Miller & Schroeder sent a status memorandum to all of the

bank lender/participants.  This memorandum reported on the events that had taken place

at the October 3, 2000 meeting with the Tribe.  As to the issue raised by the Tribe

regarding NIGC approval of the Pledge Agreement, Miller & Schroeder stated the

following:

> At the meeting one of the Tribal Council members took the position that
> the President loan was not approved by the National Indian Gaming
> Commission and, as a consequence, the Tribe does not have to recognize
> or comply with the Notice and Acknowledgment of Pledge and Miller &
> Schroeder's secured interest in the Development Expenses.  Our attorneys
> have advised us that that conclusion is incorrect and not sustainable as the
> loan was not to the Tribe but rather to the management company retained
> by the Tribe under the Management Agreement.

(App. 777.)

On January 29, 2001, Miller & Schroeder dismissed the Tribe from the President

Litigation.  (App. 884.)  Dorsey contends that the dismissal allowed for a more

---

(Footnote Continued From Previous Page)
that he was either representing both Miller & Schroeder and the bank lender/participants
or that he was representing Miller & Schroeder, but did not want to draw attention to the
fact that Bremer should seek its own attorney.  Further, if Thomas truly believed that he
was only representing Miller & Schroeder, then once he saw that Jensen/Bremer was
present without its own attorney, than a reasonable attorney would have taken a moment
before the meeting started to make sure that Jensen understood that Dorsey was at the
table representing Miller & Schroeder, not Bremer, and to recommend that Bremer seek
counsel of its own.  And, even if such a conversation did not take place prior to the
meeting, it should have taken place after the meeting given the stance that the Tribe took
on the NIGC approval issue during the meeting.

expeditious pursuit of the claims against President and that its belief was that it could obtain the necessary financial statements from the Tribe through the subpoena process. Litigation continued for over a year, and during that time Dorsey did not obtain such statements from the Tribe.

On February 21, 2002, a United States District Court Judge granted summary judgment in favor of Miller & Schroeder, and on April 16, 2002, the court entered judgment in the amount of $15,681,528.16 (the "President Judgment").  (App. 934-46, 951.)  Approximately three years later, on April 11, 2005, Bremer and the other participants settled with the Tribe whereby the Tribe paid Bremer $650,000 and the other participants $3,453,588 for an assignment of their interests in the President Judgment. (App. 971-84.)

## IV.   The Bremer Litigation

After the October 3, 2000 meeting with the Tribe, Miller & Schroeder, and Dorsey, Bremer retained Winthrop & Weinstine to represent it in an action against Miller & Schroeder.  On December 7, 2000, Robert Weinstine from Winthrop & Weinstine met with Thomas, who appeared on behalf of Miller & Schroeder, whereby Weinstine presented Thomas with a draft complaint.  (App. 824.)  In the draft complaint, Bremer made certain allegations against Miller & Schroeder for misrepresentation and fraud in the inducement pertaining to the sale of the loan participation to Bremer, and also made certain statements suggesting negligence by Dorsey for its advice that NIGC approval was not required and for not procuring the approvals.  (App. 827, 833-35 at ¶¶ 16-19.)  At

this meeting, Thomas did not disclose the possible conflict that Dorsey might have in representing Miller & Schroeder in an action brought by Bremer.

After receiving this draft complaint, Thomas sent a memorandum to Dorsey attorneys Rindels and Brian Palmer (Dorsey litigation partner), carbon copying Jarboe, Thomas Tinkham (Dorsey's loss prevention partner), and William Wernz (Dorsey's ethics partner), asking them to confirm the facts as he understood them and asking whether Dorsey would be disqualified as Miller & Schroeder's counsel if Rindels was a potential fact witness. (App. 824-25.) Thomas concluded the memorandum by stating, "Oppenheimer, Wolff & Donnelly is lobbying Miller & Schroeder to represent them on this issue but I would obviously prefer to keep all of this within the firm to the extent we can." (App. 825.) Thomas did not mention in this memo anything regarding a possible conflict of interest in representing Miller & Schroeder in this action because of its representation of Bremer in the President Litigation, nor did it, at a minimum, raise the issue that Dorsey was likely going to be accused of representing Bremer, which would then raise a conflict of interest.

On December 8, 2000, Thomas reported to Miller & Schroeder that Rindels, Jarboe, and others "express[ed] the view that NIGC approval is irrelevant." (App. 821.) Wernz also had responded on the disqualification issue stating that "[t]he answer is no, unless Paula's testimony is necessary and is also adverse to [Miller & Schroeder]. Even then, Dorsey would be disqualified only 'at trial.'" (App. 817.) Wernz based his opinion on the facts that Thomas had presented in his memo. (*Id.*)

On December 18, 2000, Thomas sent a letter to Winthrop & Weinstine in response to the draft complaint, wherein he asserted that approval was not necessary because the loan was not to the Tribe, but was to President, and claimed that the issue of non-payment was "not due to any NIGC failure to approve the [Pledge Agreement] but, rather, from the fundamental inability of the project to generate revenues that would permit payment of the Pledged Revenues to President or [Miller & Schroeder]."  (App. 850-51.)  Thomas also stated the following:

> [Miller & Schroeder] concluded with the concurrence of my firm that NIGC approval was not required with respect to the loan documents and the Notice of Acknowledgement of Pledge.  Conversations with the NIGC had indicated that they were only interested in whether [Miller & Schroeder's] interest in the management fees and the payment of development expenses would give [Miller & Schroeder] the ability and authority to manage the casino in the event of non-payment of accounts due.[29]  As you know, [Miller & Schroeder] has no such management rights, and the NIGC was only interested in verifying that fact.

(App. at 851 (emphasis added).)

Within days after Bremer received this letter, Bremer filed suit against Miller & Schroeder in Ramsey County District Court.  (App. 863-83.)  In its filings, Bremer had withdrawn the suggestions that it had made in its draft complaint regarding Dorsey's actions.  (App. 871-73 at ¶¶ 16-19.)  On or about January 19, 2001, Dorsey filed an Answer on behalf of Miller & Schroeder.  (TA 334-42.)  Dorsey had not explained the potential conflict in representing Miller & Schroeder against Bremer to either of the two

---

[29]    This statement is contrary to what Karns had reported to Rindels, stating that Stuckwisch "indicated that NIGC merely needs to review the loan documents to ensure that the loan agreement does not provide for management of the casino, _or an interest in the management fee, as security_."  (TA 309 (emphasis added).)

parties, nor had Dorsey obtained consent to waive any such conflicts from Miller &

Schroeder and/or Bremer.

The litigation continued for the next 15 months.  William Dornbos, a Dorsey

associate, was staffed on the case.  In working on Miller & Schroeder's defense, Dornbos

reviewed the files and prepared a timeline of events.  (App. 917-27.)  Regarding the

June 29, 2000 Thomas Memo and Rolbiecki cover letter that was sent to the bank

lender/participants, Dornbos stated "Participant update re: *Retention of John Thomas as*

*counsel for participants* and enclosing Thomas's memo to participants re: St. Regis

Loans."  (App. at 924 (emphasis added).)

Then, on May 4, 2001, Thomas asked Dornbos some specific questions regarding

the Bremer litigation:  "What is our strategy if we have one?  Where are we on

discovery?  Any big problems we see so far: Any luck in getting a gaming/ NIGC

Expert?  What does the discovery and trial schedules look like."  (App. 916.)  Dornbos

responded to Thomas' questions two days later, stating that as to discovery, "[d]eposing

someone from the NIGC would probably be pointless as we've discussed before and

would probably undercut whatever our NIGC expert might have to say on the issue."

(App. 915.)  Dornbos also reported that Jarboe was leading the effort in retaining an

NIGC expert and that he had contacted someone "who worked at the NIGC and is a

Dorsey friend."  (*Id*.)  In addition, as to Thomas' inquiry regarding anticipated problems,

Dornbos identified the problems that he saw in Dorsey representing Miller & Schroeder:

> There are really three representations involved in this case – the first is
> Dorsey's representation of Miller & Schroeder with respect to the Loans,
> the second is *Dorsey's representation of Miller & Schroeder and the*

*participants* with respect to the action against President R.C., and the third is Dorsey's representation of Miller & Schroeder with respect to Bremer's action against Miller & Schroeder.  The first two present privilege problems.  The privilege as to the first was likely waived by Miller & Schroeder when Bud [Jensen] was given access.  The privilege as to the second probably also no longer exists because *Bremer is really a former client* and has appeared to waive that privilege by suing Miller & Schroeder . . . . *we are likely going to have [to] withdraw from representing Miller & Schroeder because we will then have potential adversity with the client.*  Bremer has made it clear that it will make several Dorsey attorneys witnesses.  Perhaps Winthrop is bluffing, but their aggressive pursuit of Dorsey communications leads me to believe that *they have Dorsey's transaction advice at the center of their strategy.  Combine that with the privilege issues and it is difficult for me to see how we could represent Miller & Schroeder at trial, even if it is technically possible.*

(App. 916 (emphasis added).)  At no time did anyone at Dorsey correct Dornbos' statements if they were wrong.

In February 2002, a Ramsey County District Court Judge granted summary judgment in favor of Erickson and Frank, who had also been sued individually.  (App. 929-33.)  In January 2002, Miller & Schroeder filed for Chapter 7 bankruptcy relief, and thereafter, the Bremer Litigation was stayed.

## V.   Procedural History

After Miller & Schroeder filed for bankruptcy, the Trustee, Marshall, and 31 of the bank participants commenced an adversary complaint against Dorsey in Federal Bankruptcy Court, alleging professional negligence/malpractice – intended beneficiary, negligent misrepresentation, breach of contract, breach of fiduciary duty.  (App. 1-31.) The negligence claims are based on the legal advice Dorsey gave to Miller & Schroeder prior to closing that the Pledge Agreement did not require NIGC approval to be enforceable.  The breach of fiduciary duty claim is based on a duty by Dorsey to disclose

to Miller & Schroeder and Marshall:  (1) that Dorsey had a conflict of interest in representing them in suits brought by bank lender/participants; and (2) that Miller & Schroeder had a third-party claim against Dorsey which should be asserted by Miller & Schroeder in the suits brought by the bank lender/participants.  (App. 29.)  The bankruptcy court dismissed Marshall's malpractice claim and the Trustee voluntarily dismissed its malpractice claim.

On January 10, 2005, the bankruptcy court also dismissed 28 of the 31 bank lender/participant plaintiffs and on May 11, 2005, abstained from hearing the other three bank lenders' claims.  This left only the fiduciary duty claim by the Trustee and Marshall in this action before the bankruptcy court (the "Trustee/Marshall case").

In February 2005, after being dismissed from an adversary proceeding in Miller & Schroeder's bankruptcy case, the 31 bank lender/participants (not including Bremer), filed suit in Hennepin County District Court against Dorsey, alleging professional negligence/malpractice–intended beneficiary, negligent misrepresentation, breach of contract, and breach of fiduciary duty.[30]  On January 17, 2006, the Hennepin County Court granted summary judgment in favor of Dorsey, concluding, among other things, that the bank lender/participants' third-party beneficiary claim failed.  The bank lender/participants appealed.  On January 10, 2007, the Minnesota Court of Appeals affirmed in part, reversed in part, and remanded, concluding that "genuine issues of

---

[30]    The parties thereafter dismissed the bank lender/participants' claim for breach of fiduciary duty pursuant to stipulation.

material fact exist as to whether appellants were third-party beneficiaries of respondent's legal services and whether appellants had an implied contract for legal services with respondent[.]" *McIntosh County Bank v. Dorsey & Whitney, LLP*, 726 N.W.2d 108, 111-12 (Minn. Ct. App. 2007).[31]

Back in 2005, after the 31 bank lender/participants had been severed from the bankruptcy court case, Bremer and the Trustee filed a separate bankruptcy court action alleging professional negligence/malpractice–intended beneficiary, negligent misrepresentation, breach of contract, and indemnity/contribution (the "Bremer/Trustee case"). (App. 52-74.) This case was thereafter consolidated with the "Trustee/Marshall case" previously mentioned. (App. 91-92.)

After the bankruptcy court denied Dorsey's summary judgment motion, the cases proceeded to a seven-day trial. On August 28, 2006 (amended August 30, 2006), the United States Bankruptcy Court Judge issued both an Order for Judgment with respect to the fiduciary duty claims (i.e., the "Trustee/Marshall case") and a Report and Recommendation with respect to the malpractice claims (i.e., the "Bremer/Trustee case"). (App. 93-241.) In the Order, the bankruptcy court concluded that Dorsey had breached its fiduciary duties and ordered Dorsey to disgorge all fees it earned in the President and Bremer litigations—$836,344.32 for the Trustee, subject to the Trustee's obligation to reimburse the bank lender/participants for the amount each paid Miller & Schroeder for

---

[31]     On February 6, 2007, Dorsey filed a petition for further review with the Minnesota Supreme Court and on March 20, 2007, the Minnesota Supreme Court granted that petition.

said attorney's fees, and $51,099.88 for Marshall—plus pre-judgment interest.  (App. 240.)  Dorsey voluntarily consented to the entry of final judgment by the bankruptcy court as to this case.

In the Report and Recommendation, the bankruptcy court recommended that Bremer does have standing to sue Dorsey and that Dorsey did commit legal malpractice. The bankruptcy court recommended judgment against Dorsey in the amount of $1,759,000 plus pre-judgment interest to Bremer.  (App. 240.)  This amount was calculated by adding Bremer's original $2,000,000 investment and the $409,000 in fees and expenses Bremer incurred during the Bremer litigation, and subtracting the $650,000 received in the settlement with the Tribe.[32]  (*Id.*)

Dorsey filed objections to the Report and Recommendation and filed an appeal with respect to the Order.  (App 242-341.)  Both matters are before this Court now and are dealt with in turn below.

## REPORT AND RECOMMENDATION

As stated above, this matter is before the Court pursuant to Dorsey's objections to the bankruptcy judge's Report and Recommendation dated August 28, 2006 (amended August 30, 2006).  In that Report and Recommendation, the court recommended that:

1.      Bremer have judgment against Dorsey on Counts I and III of Case Number 05-4051 for $1,759,000.00 (calculated by adding the original $2,000,000 investment and the $409,000 in fees and expenses incurred in

---

[32]      The bankruptcy court also recommended that the Court dismiss Count II (negligent misrepresentation), and dismiss Count IV (indemnity/contribution) as moot. (App. 241.)

pursuing the Bremer/Miller & Schroeder action and subtracting the $650,000 received in the settlement with the Tribe), and prejudgment interest on said sum as calculated pursuant to Minnesota Statute § 549.09 commencing on February 23, 2005, and concluding on the date of entry of judgment.

2.     Dorsey have judgment dismissing Count II of the Complaint in Case Number 05-4051.

3.     Count IV of the Complaint in Case Number 05-4051 be dismissed as moot.

(App. 240-41.)  Dorsey raises several objections with respect to the Report and Recommendation, all relating to the basis for the bankruptcy court's recommendation for judgment against Dorsey as to Bremer's claims for professional negligence/malpractice–intended beneficiary and breach of contract.

Based upon the Court's independent *de novo* review of the record and all of the arguments and submissions of the parties and the Court being otherwise duly advised in the premises, the Court hereby enters the following:

## ORDER

1.     Dorsey's amended objections to the Report and Recommendation (Civil No. 06-3962; Doc. No. 7) are **SUSTAINED IN PART AND OVERRULED IN PART**.

2.     The Report and Recommendation dated August 28, 2006 (amended August 30, 2006) (Doc. No. 1), is **ACCEPTED IN PART AND REJECTED IN PART,** and the conclusions therein are **ADOPTED TO THE EXTENT THEY ARE NOT INCONSISTENT WITH THIS OPINION AND MODIFIED AS EXPLAINED HEREIN**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

**MEMORANDUM**

## I.    Standard of Review

This Court reviews a bankruptcy court's Report and Recommendation under a
*de novo* standard.  *See* 28 U.S.C. § 157(c)(1); Fed. R. Bankr. P. 9033(d).  The Court may
accept, reject, or modify the proposed findings of fact or conclusions of law.  *Id.*

## II.    Objections to Proposed Findings of Fact

Dorsey objects to the bankruptcy court's proposed findings of fact claiming that
they "lack evidentiary support in the record, are contrary to the record evidence, or both."
(Def. Dorsey's Amended Obj. at 2.)  The Court directs the parties to the "Background"
section above for the fact-findings that the Court finds are relevant to its decision.  The
Court accepts in part the bankruptcy court's findings of fact to the extent they are
consistent with those recited above.

## III.    Objections to Proposed Conclusions of Law

### A.    Issue and Claim Preclusion

Dorsey argues that the issue of whether the bank lender/participants have standing
to sue Dorsey has already been decided by the Hennepin County Court in its summary
judgment order, and therefore issue and claim preclusion apply barring a determination as
to Bremer's standing.  The bankruptcy court recommends that the Court find Dorsey's
argument is without merit because the bankruptcy court's summary judgment decision
against Dorsey was issued before the Hennepin County Court's decision and because
Bremer was not a party or in privity with a party to the state litigation.  After conducting
a *de novo* review of the record and all submissions by the parties, the Court agrees with

the bankruptcy court's recommendation in all respects in this regard, and incorporates by reference the relevant portion of the bankruptcy court's Report and Recommendation here. (*See* App. 98-101.)

## B.    Bremer's Standing

Generally, an attorney is liable only to those with whom he has an attorney-client relationship. *Marker v. Greenberg*, 313 N.W.2d 4, 5 (Minn. 1981). Minnesota courts also recognize liability under a third-party-beneficiary theory, an implied contract theory, and a tort theory of representation. *Admiral Merchs. Motor Freight, Inc. v. O'Connor & Hannan*, 494 N.W.2d 261, 265 (Minn. 1992). While a party's mere expectation that an attorney will represent him or her is insufficient to create an attorney-client relationship, *Gramling v. Mem'l Blood Ctrs. of Minn.*, 601 N.W.2d 457, 460 (Minn. Ct. App. 1999), determining whether an attorney-client relationship exists is usually a question of fact that depends on the communications made and the circumstances surrounding the situation. *Admiral Merchs.*, 494 N.W.2d at 265.

The bankruptcy court determined that Bremer has standing to sue Dorsey for alternative reasons. First, the court found Bremer had a direct attorney-client relationship with Dorsey. Alternatively, the court found that Bremer was a third-party beneficiary of Dorsey's legal services. (App. 196.) The Court will address each theory in turn.

## 1.    Direct Attorney-Client Relationship

In Minnesota, a party can establish a direct attorney-client relationship by showing the parties "either explicitly or implicitly agreed to a contract for legal services." *Gramling*, 601 N.W.2d at 459. "A contract for legal services can be express or implied

from the conduct of the parties." *Pine Island Farmers Coop v. Erstad & Riemer, P.A.*, 649 N.W.2d 444, 448 (Minn. 2002).  Also, under a tort theory, "an attorney-client relationship is created whenever an individual seeks and receives legal advice from an attorney in circumstances in which a reasonable person would rely on such advice." *Admiral Merchs.*, 494 N.W.2d at 265-66 (Minn. 1992).

### a.      From retention through closing

The bankruptcy court recommends that the Court find a direct attorney-client relationship was formed between Dorsey and Bremer when Dorsey was retained and began work on the loan documents in 1998.  The bankruptcy court cites to law relating to both implied contract and tort theories, and to the Restatement (Second) Law of Agency. The bankruptcy court concludes that "Dorsey and Miller & Schroeder fully understood and intended that . . . Miller & Schroeder was retaining Dorsey to represent the loan participants under the participation agreements," "[t]he evidence was compelling that Miller & Schroeder was not understood nor intended to be, and was not, the actual client," and "[t]he evidence is also compelling that the loan participants, including Bremer, were intended by all to be, and in fact were, the clients."  (App. 198.)

Dorsey argues that the bankruptcy court's conclusions are wrong.  Dorsey relies on (1) Jarboe, Rindels, Erickson, and Mary Jo Brenden's (Miller & Schroeder's Associate General Counsel) testimony that Bremer was not Dorsey's client in the loan transaction; (2) the fact that neither Miller & Schroeder nor Dorsey knew at the time of Dorsey's initial retention for its work on the loan transaction that Bremer was going to be a participant; (3) Bremer did not communicate with Dorsey prior to the loans closing;

(4) Bremer did not ask Dorsey to represent its interests, Miller & Schroeder did not tell

Dorsey that it was Bremer's attorney, and Dorsey did not agree nor act as though it

represented Bremer; (5) Dorsey did not correspond with Bremer prior to the closing; and

(6) Dorsey did not bill Bremer for its work performed in the loan transactions.

Bremer, on the other hand, asserts that the bankruptcy court is correct in finding a

direct attorney-client relationship, arguing that the following evidence supports the

conclusion:  (1) Rindels and Jarboe's testimony that Miller & Schroeder was Dorsey's

only client is self-serving; (2) the engagement letters indicate that the only parties to be

benefited from Dorsey's services were the bank lenders; (3) the identities of the bank

lenders were known to Miller & Schroeder, and neither Miller & Schroeder nor Dorsey

communicated to Bremer that Dorsey's representation was limited; and (4) Miller &

Schroeder was prepared to relinquish its position as lender-principal in order to meet

certain New York state requirements.  In addition, Bremer asserts that the bankruptcy

court is correct in applying agency law as support for its conclusion, claiming that Miller

& Schroeder retained Dorsey as agent for the prospective bank lenders (i.e., unidentified

principals).  Bremer asserts that in this context, it was fair and reasonable for Bremer to

expect that Dorsey was applying the proper standard of care in documenting, structuring,

and closing the loans, and that Dorsey was doing so to protect the bank

lender/participants.

After a full review of the record, the Court agrees with the bankruptcy court that

Bremer has standing to bring a legal malpractice claim against Dorsey, but respectfully

rejects the bankruptcy court's recommendation that the Court find a direct attorney-client

relationship was created upon Dorsey's retention and commencement of work on the loan transaction.  Instead, the Court finds that Bremer has standing based on a direct attorney-client relationship formed in June 2000.

The bankruptcy court concludes that "Dorsey was counsel to the lender and the lender was the loan participants, including Bremer."  (App. 199.)  While Bremer asserts that the bankruptcy court is correct, Dorsey contends that Miller & Schroeder was the "lender," and bore the risk of non-payment until it participated the entire loan balance. The Court agrees with Dorsey in that the loan documents clearly intended for the "lender" to be Miller & Schroeder and identified Miller & Schroeder as the "lender," at least up until an assignment of Miller & Schroeder's rights occurred.  Therefore, at the time of Dorsey's retention through closing, any evidence that Dorsey was the attorney for the "lender" is evidence in favor of Dorsey's position that it was the attorney for Miller & Schroeder.  However, it is also clear through the loan arrangement that in fact Miller & Schroeder was a nominal lender and that the bank/lender participants were the true moneylenders.  But this does not mean that an attorney could not have been retained solely for the nominal lender.

The Court respectfully rejects the bankruptcy court's assertion that the evidence reflects "Miller & Schroeder was retaining Dorsey to represent the loan participants under the participation agreements," "that Miller & Schroeder was not understood nor intended to be, and was not, the actual client," and "that the loan participants, including Bremer, were intended by all to be, and in fact were, the clients."  (App. 198.)  Miller & Schroeder retained Dorsey to represent Miller & Schroeder in the drafting of the loan

documents and to advise it as to the loan transaction and closing.  At the time of the

retention, the participation agreements had not even come into being.  Also, the testimony

of Erickson and Brenden is the best evidence showing Miller & Schroeder's

understanding and intent of Dorsey's retention, and they believed Dorsey was not

retained to represent Bremer in the loan transaction.[33]  And, the fact that Bremer would

benefit from Dorsey's work while Dorsey represented Miller & Schroeder does not, by

itself, establish that Bremer was Dorsey's client.

The evidence unequivocally shows that from the time Dorsey was retained

through closing:  (1) Miller & Schroeder did not advise Dorsey that it was retained to

represent the bank lender/participants; (2) Dorsey did not communicate with the bank

lender/participants; and (3) neither the bank lender/participants nor potential bank

lender/participants contacted Dorsey, told Dorsey that they considered Dorsey their

attorney, or asked Dorsey to represent them in connection with the loan transaction or

closing.  At this point in time, Dorsey was not acting as though it was representing

Bremer or any of the potential bank lender/participants.

---

[33]      Erickson, the person responsible for retaining Dorsey, testified that "Dorsey was retained solely to represent Miller & Schroeder" and "Dorsey was not retained in connection with the loan transaction to represent Bremer or any other bank participant as a client."  (App. 371-75.)

While not relevant here, the Court notes that neither Erickson nor anyone else at Miller & Schroeder ever informed Bremer of Miller & Schroeder's belief, including even after Miller & Schroeder received a commitment from Bremer and after Miller & Schroeder agreed to act as Bremer's agent under the Participation Agreement.

Further, the only document that Bremer was a party to was the Participation Agreement, which was entered into well after Dorsey's retention and after closing, and which contains terms that are prejudicial to Bremer. Specifically, there, Bremer acknowledged that it had "received and made a complete examination of copies of all Loan Documents it requires to be examined and approves of the form and content," "made its own credit analysis and decision to purchase its participation interest in the Loan," was "participating with Lender based upon [its] own independent examination and evaluation of the Loan transaction and the information furnished with respect to Borrower and without any representations or warranties from Lender as to the Borrower's financial suitability, the appropriateness of the investment and the value and security of the Collateral." (App. 645-46 at ¶ 3.1) These acknowledgments by Bremer make its argument that it believed Dorsey was representing it at that time more tenuous. In addition, the Participation Agreement also highlights the adversarial buyer-seller relationship between Miller & Schroeder and Bremer. Therefore, based on this document, it was reasonable for Dorsey to believe that it was not representing the bank lender/participants for the transaction. Under these facts and circumstances, the Court finds that a direct attorney-client relationship between Dorsey and Bremer was not created from the time Dorsey was retained and commenced work on the loan transaction through the closing.[34]

---

[34]     The bankruptcy court also appears to have relied on an agency theory as a basis for the attorney-client relationship, stating: "Moreover, an agent acting on behalf of a disclosed principal can make a contract for retention, in which case the agent does not

(Footnote Continued on Next Page)

(Footnote Continued From Previous Page)

become part of the resulting attorney-client relationship." (App. 198.) The Court finds, however, that the purported agent, Miller & Schroeder, *was* part of the attorney-client relationship with Dorsey, therefore *Restatement (Second) Law of Agency* § 320 does not apply here. But even if it did apply, the Court agrees with Dorsey that the record does not support the existence of any agency relationship between Miller & Schroeder and Bremer at the time that Miller & Schroeder retained Dorsey for the loan transaction work. There is no evidence in the record that at the time of the retention that Miller & Schroeder or Dorsey knew of Bremer's identity. While there is evidence that Miller & Schroeder knew of Bremer's identity as a potential and likely participant in the month prior to closing, there is no evidence showing that at that moment Miller & Schroeder intended to broaden the attorney-client relationship to include the then disclosed bank lender/participants.

Bremer contends that an agency relationship between Miller & Schroeder and Bremer is disclosed in the engagement letters between President and Miller & Schroeder because Miller & Schroeder was a nominal lender and never intended to be a true lender, which meant that Miller & Schroeder's retention of Dorsey was as agent for the bank lender/participants, who then ratified the retention by committing to fund the loans. *See Restatement (Third) of Law of Agency* § 6.02, cmt. b ("Through ratification, a person may become a party to a contract purportedly made on that person's behalf by another who acted without actual or apparent authority."). The Court finds that § 6.02 does not apply here to create an attorney-client relationship because there was no clear agreement between Dorsey and Miller & Schroeder that Dorsey was retained to represent the lender participants. Furthermore, any agency relationship between Miller & Schroeder and Bremer was created at the time that Bremer signed its Participation Agreement with Miller & Schroeder, which was not an agreement between Miller & Schroeder and Dorsey and was not representative of the relationships of the parties at the time of Dorsey's retention, again making § 6.02 inapplicable. And further yet, there is no evidence showing that at the moment Miller & Schroeder entered into these Participation Agreements, that it intended to broaden the attorney-client relationship it had with Dorsey—which was initially created for the purpose of drafting the loan documents and providing advice leading up to and through closing—to include the bank lender/participants.

The Court notes that when Miller & Schroeder entered into the Participation Agreements with the bank lender/participants, it clearly was in a position of dual loyalty whereby it was proclaiming to be an agent for the bank lender/participants, but was also acting as an agent for President. While Miller & Schroeder's actions are not at issue here, the Court believes it is worth mentioning that because of Miller & Schroeder's unclean hands, it would be unjust for any monies awarded the Trustee through this action

(Footnote Continued on Next Page)

### b.       From June 2000 through the President Litigation

In the context of Bremer's case against Dorsey here, neither the bankruptcy court nor Dorsey nor Bremer addressed whether there was a direct attorney-client relationship established between Dorsey and Bremer at some date subsequent to closing.  This fact can be partially attributed to the bankruptcy court finding an attorney-client relationship starting upon Dorsey's initial retention in 1998, which therefore presumes no need for finding a relationship at a different time.  Even so, the issue was addressed in the context of the Trustee and Marshall's fiduciary duty claims in their case against Dorsey.[35]  For consistency and convenience, the Court will address the issue now, in the context of a *de novo* review of the record, including the arguments presented by all parties, whether it was made in the briefing relating to the appeal, or whether addressed by counsel at oral argument.  Also, to avoid repetition, the Court references the bankruptcy court's conclusions made in its Order here.  In so doing, the Court recognizes it owes no deference to the bankruptcy court's conclusions when making its decision as it relates to Bremer's case (i.e., *de novo* review), and it applies a clearly erroneous standard when making its decision as it relates to the Trustee and Marshall's case.  The Court notes that the result is the same on the issue regardless of which standard is applied.

_____

(Footnote Continued From Previous Page)

to end up in the hands of Miller & Schroeder.  Instead, it is the hope of this Court that any monies awarded to the Trustee would be then allocated to Miller & Schroeder's creditors, including the bank lender/participants.  It is also for this reason that the Court gives little weight to Miller & Schroeder's disclaimers in the Participation Agreement.

[35]      The Court granted Bremer leave to file a responsive brief in the appeal, which Bremer filed on December 27, 2006.

The Court agrees with the bankruptcy court's conclusion that "as of June 29, 2000, there was an attorney-client relationship established between Dorsey and the loan participants." (App. 222.)  The bankruptcy court relies on the Rolbiecki cover letter, which states that Dorsey represented the bank lender/participants; the July 12, 2000 Thomas memorandum, which states that Dorsey "will be counsel to Miller & Schroeder Investment Corporation in representing its interest and the interests of the participants"; and the Thomas Memo, which contains legal advice regarding the bank lender/participants' rights and remedies under the loan documents, was addressed to the bank lender/participants, and was marked as "Attorney-Client Privileged."  In addition, the bankruptcy court references the internal timeline and Dornbos e-mail.  And, as further evidence that Miller & Schroeder, in its capacity as agent for the bank lender/participants, retained Dorsey on behalf of the bank lender/participants to pursue collection on the loans, the bankruptcy court points to sections 2.2 and 4.8 of the Participation Agreement. The Trustee and Marshall agree with the bankruptcy court and assert that the totality of this evidence establishes the existence of an attorney-client relationship starting in June 2000, and continuing through the President Litigation.

Dorsey argues that the bankruptcy court's finding is erroneous because it claims the evidence establishes that Bremer was not Dorsey's client at any time.  Dorsey contends that the testimony from Erickson, Brenden, and Thomas establish that Miller & Schroeder retained Dorsey in 2000 to pursue collection for itself, not for Bremer.  This includes Thomas' testimony that he never participated in meetings or telephone conferences with Bremer without Miller & Schroeder being present, and Thomas'

contention that he only sent correspondence to Bremer at Miller & Schroeder's request.
Dorsey also contends that after the Rolbiecki cover letter was sent to the bank
lender/participants, Thomas contacted Rolbiecki to let her know that the statement
indicating that Dorsey was the bank lender/participants attorney was an error.  Dorsey
contends that the proposed language that Thomas sent to Rolbiecki in the July 12, 2000
memorandum was meant to be used for communicating that error to the bank
lender/participants.

After full review of the record, and in the context of the communications and
circumstances present in and around June 2000, the Court finds that an attorney-client
relationship was established between Dorsey and Bremer in June 2000.  *See Admiral
Merchs.*, 494 N.W.2d at 265 (stating that the existence of an attorney-client relationship
is "usually a question of fact dependent upon the communications and circumstances").
Dorsey's assertion that it "fixed" the "error" that was stated in the Rolbiecki cover letter
is simply not supported by the evidence.  Thomas' July 12, 2000 memorandum to
Rolbiecki does not clearly state that Dorsey did not represent Bremer or the other bank
lender/participants.  Instead, it says that Dorsey will be representing the participants'
interests.  Dorsey cites *Bieter Co. v. Blomquist*, 132 F.R.D. 220, 224 (D. Minn. 1990), for
the proposition that representing the interests of a party is different than representing a
party as a client.  The case is distinguishable.  Here, Dorsey was representing Bremer's
interests as its client, not representing Miller & Schroeder who happened to have the
same interests as Bremer.  In fact, because Miller & Schroeder had drafted the loan
documents in an attempt to limit Miller & Schroeder's liability, Miller & Schroeder did

not have the same interests as Bremer.  And further, while Thomas knew that the Rolbiecki cover letter had been sent to the bank lender/participants, neither Thomas nor anyone at Dorsey told Bremer directly that the statement in the cover letter was made in error, or made sure Bremer understood the scope of Dorsey's representation.

While it is true that the mere fact that Miller & Schroeder told the bank lender/participants that Dorsey represented them does not create an attorney-client relationship between Dorsey and the bank lender/participants by itself, here, Dorsey's conduct also indicated that it had agreed to represent the bank lender/participants.  *See Gramling*, 601 N.W.2d at 459-60 (stating that under Minnesota law, the attorney must agree, explicitly or through its conduct, to represent the third-party); *see also Pine Island*, 649 N.W.2d at 448 (stating that an attorney-client relationship can be implied from the conduct of the parties).

For example, before the Rolbiecki cover letter was sent, Thomas sent a letter to Miller & Schroeder summarizing his qualifications, attaching information about the Dorsey firm, and specifically stating "I thought it might be useful to you *and the loan participants* to give you[36] a brief summary of my firm and my background and capability to represent you[37] in these matters."  (App. at 748 (emphasis and footnotes added).)  Then the Thomas Memo was sent which, in its entirety, directly supports that Dorsey was acting as if it were counsel to the bank/lender participants.  In particular:

---

[36]     The Court interprets "you" to mean "you and the loan participants."

[37]     The Court interprets "you" to mean "you and the loan participants."

(1) the memo is addressed to Miller & Schroeder and the loan participants; (2) the memo is labeled privileged, subject to an attorney-client privilege; (3) the first sentence says that Dorsey is responding to "your" request, with the implication being that "your" means Miller & Schroeder and the bank lender/participants; and (4) the substance of the document discusses and analyzes the legal rights and remedies of the bank lender/participants.[38] (*See supra* Background, Section III.)

Dorsey asserts that the memo contained legal advice because Erickson instructed Thomas to craft it in such a way. Thus, Dorsey asserts that it was responding to Miller & Schroeder's request. But the advice given in the memo was directed to the bank lender/participants, and neither the request nor the transfer has much weight when Dorsey is the attorney for both Miller & Schroeder and the bank/lender participants. The fact that Dorsey sent the memo to Miller & Schroeder with the expectation that it would be forwarded on to the bank lender/participants does not negate the purpose of the request, which was for Dorsey to give legal advice to its client, the bank lender/participants. Furthermore, like after the Rolbiecki cover letter was sent, Dorsey did not mention to any of the bank lender/participants that it only represented Miller & Schroeder.

Further, Bremer and the other bank lender/participants reasonably believed that Dorsey was their counsel based on these actions. *See Admiral Merchs.*, 494 N.W.2d at

---

[38]     Professor Neil Hamilton, an expert for the underlying Plaintiffs, also testified to this effect. (Tr. Vol. III at 18-19.) Hamilton also concluded that after receiving the Thomas memo, the Rolbiecki cover letter, and the information regarding Thomas and the Dorsey firm, "a reasonable and apparent expectation would be that there's an attorney-client relationship." (TA 78.)

265-66 (stating that under a tort theory, "an attorney-client relationship is created whenever an individual seeks and receives legal advice from an attorney in circumstances in which a reasonable person would rely on such advice"). Dorsey attorney Dornbos' work on the file, including his timeline and e-mail (*see supra* Background, Section IV), is evidence of what a reasonable person would have thought after receiving the Rolbiecki cover letter and Thomas Memo. Therefore, the fact that Dornbos had no personal involvement in the matter when these communications were being made does not help Dorsey's case. Additionally, after reviewing the record, it appears that Dornbos was the only Dorsey attorney who correctly analyzed the attorney-client issue, or at least the only attorney who put his beliefs in writing; if other Dorsey attorneys held the same view as Dornbos, they were careful not to make a record of their beliefs. Nonetheless, none of the other attorneys at Dorsey corrected Dornbos if they believed he was wrong. As the Trustee asserts, and as the evidence reflects,[39] Dorsey undertook the direct representation of the bank lender/participants and was acting as such.

In addition, agency law aside, Dorsey's contention that there is no evidence that Miller & Schroeder or Dorsey *agreed* that Bremer was to be Dorsey's client is wrong. The Participation Agreement, which was drafted by Miller & Schroeder and reviewed by Dorsey, was an agreement between Miller & Schroeder and Bremer. And specifically, sections 2.2 and 4.8 evidence that Miller & Schroeder retained Dorsey as counsel to

---

[39]     In addition to the written communications that indicate that Dorsey was acting as Bremer's attorney, the record reflects that Dorsey participated in phone conferences and meetings with Bremer, including the October 3, 2000 meeting, and at no time did Dorsey tell anyone that it was not representing Bremer.

pursue collection in the President litigation not only for Miller & Schroeder, but also as counsel for the bank lender/participants.

Section 4.8 states: "If Lender is of the opinion that the services of an attorney should be retained for the protection of the interest of Lender, Participant, any Other Participant(s), Lender shall select and retain an attorney to represent Lender, Participant, any other Participant(s)." (App. 648.)  Miller & Schroeder was of the opinion that Dorsey should be retained for the protection of the interests of Bremer–pursuing the collection of the monies due under the loan was in the interests of Bremer as a bank lender/participant.  And pursuant to § 4.8, Miller & Schroeder was then required to select and retain an attorney to represent Bremer, which it did.  This provision is evidence that both Miller & Schroeder and Dorsey had agreed that, in such circumstances, the bank lender/participants would be Dorsey's clients.

Section 2.2 states in relevant part:

> The Participant hereby approves of and authorizes the Lender to . . . generally act as agent for all the Participants in the holding and disposition of the Collateral.  The Lender agrees that the Lender holds the security interests and other interests granted by the Note and the Loan Documents not in its individual capacity but rather as agent for the Participants in accordance with this Agreement.

(App. 645.)  Thus, Miller & Schroeder is defined as agent for the bank lender/participants in matters relating to the disposition of the collateral and to the bank lender/participants' security interests.  Because the retention of Dorsey was for the purpose of collecting the amount due on the loans, which effects the disposition of the collateral and the security interests of the bank lender/participants, pursuant to this provision, Miller & Schroeder

was acting in its agency capacity, which lends further support to the conclusion that

Miller & Schroeder retained Dorsey on behalf of the bank lender/participants.[40]

Dorsey contends that Miller & Schroeder retained Dorsey under § 6.2.4 instead of

§ 4.8.  Even if that were true, Dorsey incorrectly asserts that this makes a difference.

Section 6.2.4, which states that enforcement proceedings "shall be instituted by Lender

and counsel of its choice," (App. 651) is not inconsistent with § 4.8.  Although § 6.2.4

states that Miller & Schroeder is the party who will institute the enforcement proceedings

and hire counsel, § 4.8 states that if Miller & Schroeder believes an attorney should be

retained to protect its interests and the interests of the bank lender/participants, Miller &

Schroeder shall select and retain an attorney to represent both itself and the bank

lender/participants.  Thus, the two provisions are not mutually exclusive.  Under both

§ 6.2.4 and § 4.8, Miller & Schroeder bears the burden to hire counsel to represent the

bank lender/participants after instituting enforcement proceedings to protect the bank

lender/participants' interests.[41]

---

[40]    The fact that Miller & Schroeder drafted and Dorsey reviewed §§ 2.2 and 4.8 prior
to the execution of Bremer's Participation Agreement is yet another reason why it was
reasonable for Bremer both to believe Dorsey was its attorney beginning in June 2000
and to rely on Dorsey's advice during the President Litigation.

[41]    The Court agrees with the bankruptcy court, the Trustee, and Marshall that the fact
that Bremer was not named as a party plaintiff in the President Litigation, or whether it
could have been named, is irrelevant when determining whether Dorsey was retained as
Bremer's attorney.  Any entity can have an attorney representing it, whether that entity is
a named party to an action or not.

Finally, Dorsey's reliance on *In re Colocotronis*, 449 F. Supp. 828 (S.D.N.Y. 1978), and others is misplaced.  Here, the parties contractually agreed for one party to retain counsel for the other and acted as if Dorsey had been retained to represent the bank lender/participants.  Additionally, the evidence shows that Bremer relied on Dorsey's legal advice.  Further, unlike *In re Colocotronis*, the servicer (Miller & Schroeder) did not request advice from the hired attorney as to its own duties, but, instead, was requesting advice as to the bank lender/participants' remedies.

Thus, the case law does not support Dorsey's assertion that no attorney-client relationship existed between it and Bremer.  After reviewing the entire record, all of the above evidence, viewed under the totality of the circumstances, compels the Court to conclude that an attorney-client relationship was established between Dorsey and Bremer in June 2000.  Therefore, Bremer has standing to assert any malpractice claim against Dorsey that was born once that relationship was established.[42]

### 2.      Third-Party Beneficiary

Because the Court finds that Bremer has standing based on the attorney-client relationship that was formed between Dorsey and Bremer just prior to and during the President Litigation, the Court need not determine whether Bremer has standing to sue

---

[42]      Because the evidence supports finding an attorney-client relationship between Dorsey and Bremer beginning in June 2000, the Court need not consider the theory that an attorney-client relationship was created based on an agency relationship between Miller & Schroeder and Bremer at that time.  Nonetheless, the Court sees merit in the bankruptcy court's application of those doctrines as to the President Litigation time-period and does not find clear error.

based on some other theory.  However, because the bankruptcy court, the Hennepin

County Court, and the Minnesota Court of Appeals, have addressed the issue with

differing results, the Court notes the following.[43]

The highly cited third-party beneficiary case *Marker v. Greenberg* states that an

attorney may be held liable to a nonclient when "the client's sole purpose in retaining an

attorney is to benefit directly some third party." 313 N.W.2d at 5.  The third party "must

be a direct and intended beneficiary of the lawyer's services." *Id.* (quoting *Brody v.

Ruby*, 267 N.W.2d 902, 906 (Iowa 1978)).  The exception for nonclient attorney

malpractice claims is a narrow one. *Id.* ("The relaxation of the strict privity requirement

is very limited[.]"); *see also Holmes v. Winners Entm't, Inc.*, 531 N.W.2d 502, 505

(Minn. Ct. App. 1995) (refusing to extend the exception to a shareholder's claim of

malpractice brought against attorneys retained by the corporation).

Here, Dorsey contends that Bremer was not a third-party beneficiary to the loan

transaction because Dorsey was not retained for the "sole purpose" of benefiting Bremer.

Although the Court finds that the primary purpose in retaining Dorsey was to benefit

Miller & Schroeder, the Court finds that Dorsey's rigid analysis is not what *Marker*

---

[43]     The bankruptcy court concludes in the alternative that Bremer also had third-party
beneficiary standing to sue Dorsey for legal malpractice.  The Hennepin County Court
found that the bank lender/participants were not the intended direct beneficiaries of the
attorney-client relationship between Miller & Schroeder and Dorsey and therefore
granted summary judgment in favor of Dorsey.  The Minnesota Court of Appeals found
that genuine issues of material fact existed as to whether the bank lender/participants
were third-party beneficiaries of Dorsey's legal services and that the district court erred
in its application of the law in declining to apply the *Lucas* factors to determine whether
the bank lender/participants were third-party beneficiaries of Dorsey's representation.

requires.  To understand what the *Marker* court meant by "sole purpose," one must take into account the context of that case and other cases like *Marker* that have allowed for third-party beneficiary liability.

Specifically, the third-party beneficiary exception to the strict privity requirement evolved from cases involving the drafting or executing of a will, whereby a testator hired an attorney to draft a will and clearly expressed a desire for the beneficiary to receive "X."  But then, through no fault of the testator, the attorney's negligent act caused the intended beneficiary to lose the intended bequest.  *See Marker*, 313 N.W.2d at 5.  There, the testator *was* receiving a benefit through the attorney's work in that he/she would have peace of mind knowing that his/her wishes upon death would be carried out.  However, the "sole purpose" in the bequest, meaning the intended and main purpose other than its own peace of mind, was to benefit the beneficiary.  *See Lucas v. Hamm*, 364 P.2d 685, 689 (Cal. 1961) ("[T]he main purpose of a contract for the drafting of a will is to accomplish the future transfer of the estate of the testator to the beneficiaries named in the will . . . .  Since . . . the main purpose of the testator in making his agreement with the attorney is to benefit the persons named in his will and this intent can be effectuated, in the event of a breach by the attorney, only by giving the beneficiaries a right of action, we should recognize, as a matter of policy, that they are entitled to recover as third-party beneficiaries.").  Therefore, a duty to a third party exists only when the client's intent to benefit the third party is clearly established.  *CPJ Enters., Inc. v. Gernander*, 521 N.W.2d 622, 624 (Minn. Ct. App. 1994).

Here, the parallel analysis would require that Miller & Schroeder's intent in retaining Dorsey to work on the loan documents was to mainly benefit Bremer.  But the record does not support such a finding.[44]  Miller & Schroeder is not claiming that its intent was not carried out.  And there is no evidence suggesting that Miller & Schroeder instructed Dorsey that it wanted the benefits from Dorsey's work to go to Bremer (i.e., that it intended for "X" to go to Bremer), nor is there evidence that the purpose of the loan agreement was to benefit primarily Bremer as opposed to secure the loan and close the deal.[45]  In fact, Miller & Schroeder was, at least up until the Participation Agreement was signed, solely a placement agent for President.  Any benefit to Bremer flowed through the loan transaction, and therefore was incidental, not direct as required by *Marker*.  *See Holmes*, 531 N.W.2d at 505; *CPJ* Enters, 521 N.W.2d at 624.  Finally, while the exception for nonclients presumes that the beneficiary's interests are precisely the same as the client, here, they were not.  Therefore, the Court finds that the third-party beneficiary exception should not be extended to a bank lender/participant's malpractice claim against the attorneys retained by the named lender under a loan agreement.

Because Bremer was not an "intended" third-party beneficiary of Miller & Schroeder's attorney-client relationship with Dorsey, the Court does not reach the

---

[44]    Although the Court does not base its conclusion on *Restatement (Third) of the Law Governing Lawyers* § 51, the Court notes that the facts here do not meet the requirements of § 51 to impose liability because Miller & Schroeder's primary intent in retaining Dorsey, at the time of the retention, was to benefit itself as placement agent.

[45]    Here, if Miller & Schroeder would have signed a retainer agreement with Dorsey stating that its intent in hiring Dorsey was to directly benefit Bremer, the Court's decision might be different.

multi-factor *Lucas* analysis.  *See Francis v. Piper*, 597 N.W.2d 922, 925 (Minn. Ct. App. 1999) (determining third party was not an intended beneficiary and not reaching multi-factor analysis); *Holmes*, 531 N.W.2d at 505 (same).[46]

### C.    Malpractice

A legal-malpractice claim requires four elements:  "(1) the existence of an attorney-client relationship; (2) acts constituting negligence or breach of contract; (3) that such acts were the proximate cause of the plaintiff's damages"; and (4) that "but for defendant's conduct, the plaintiff would have obtained a more favorable result in the underlying transaction than the result" that occurred.  *Jerry's Enters. v. Larkin, Hoffman, Daly & Lindgren, Ltd.*, 711 N.W.2d 811, 816, 819 (Minn. 2006).  As stated above, the Court finds an attorney-client relationship was established between Dorsey and Bremer in June 2000; therefore, the first element is met.

As to the second element, the bankruptcy court focuses on Dorsey's negligence during an earlier time period and recommends that Dorsey was negligent in closing the St. Regis loans without first obtaining NIGC approval of the Pledge Agreement.  The bankruptcy court bases its recommendation on its conclusion that under regulatory law, the Pledge Agreement was an assignment of a management agreement and a change in a

---

[46]    The Court understands that this is a departure from the recent Minnesota Court of Appeals ruling in the 31 other bank lender/participants' case against Dorsey.  The Court, however, notes that even if the *Lucas* factors were applied to this case, the Court would still not consider Bremer a third-party beneficiary.  For example, Dorsey asserts that, at the time of the loan transaction, they believed no NIGC approval was needed, and Bremer acknowledged that it would do its own independent review of the loan transaction documents.  Therefore, there was no clear foreseeable harm known to Dorsey.

person with a financial interest, both of which necessitate gaining NIGC approval.  The bankruptcy court also concludes that the Pledge Agreement was contingent on the approval of the Amendment, which was not approved, and which therefore also made the Pledge Agreement unenforceable.

Dorsey contends that it was not negligent in closing the loans because its only responsibility was to provide Miller & Schroeder with correct advice.  Dorsey argues that the Pledge Agreement is not an assignment of a management agreement and does not create a change in persons with a financial interest.  Dorsey also argues that the effectiveness of the Pledge Agreement is not conditioned on the approval of the Amendment.  As such, Dorsey's argument is based completely on the premise that it was correct in concluding that NIGC approval was not needed and that when an attorney's advice is correct, an attorney does not have a further duty.

Bremer asserts that the bankruptcy court is correct, arguing that the Pledge Agreement required NIGC approval because it:  (1) modified the Management Agreement; (2) was an assignment of rights under that agreement; (3) effected a change in persons with a financial interest; and (4) was a collateral agreement.  In addition, Bremer asserts that the Amendment required NIGC approval according to the Tribe's Resolution, which also was a condition precedent to the Pledge Agreement becoming enforceable, and that the Management Agreement itself required NIGC approval of the loans.  Bremer also asserts that Dorsey's internal discussions regarding NIGC approval, submission of the loan documents and Pledge Agreement to NIGC for review, and actions post-closing whereby it continued to check the status of those documents with the

NIGC, indicate that on or around February 1999, Dorsey both concluded and was acting as if it believed NIGC approval was required.[47]

After a review of the record, the Court finds that Dorsey did commit malpractice based on a breach of its standard of care. Specifically, Dorsey did not disclose to Bremer, its client as of June 2000, Dorsey's underlying negligence and the facts and circumstances surrounding the negligence (i.e. not advising Miller & Schroeder to hold up closing pending a decision from the NIGC). The acts and events that made up Dorsey's underlying negligence were directly related to the retention of Dorsey on Bremer's behalf to pursue collection under the loans.

Under Minnesota law, an attorney is obligated to advise a client with "that degree of care and skill that is reasonable under the circumstances, considering the nature of the undertaking." *Prawer v. Essling*, 282 N.W.2d 493, 495 (Minn. 1979). Failure to

---

[47] Bremer also asserts that Dorsey tried to hide its malpractice from Bremer and the other participants, which it claims is supported by the following evidence: (1) Dorsey did not disclose its failed attempts to procure NIGC approval both before and after the closing; (2) Dorsey did not disclose the internal discussions concluding that the loans should not close without approval; (3) after the Tribe asserted that the participants had no claims against the Tribe, Thomas wrote to the participants, "our attorneys have advised us that that conclusion is incorrect and not sustainable as the loan was not made to the Tribe but rather to the management company retained by the Tribe under the Management Agreement," (App. 777), which Bremer asserts is irrelevant to whether the loan documents required NIGC approval; (4) Dorsey dismissed the Tribe from the President Litigation, leaving the only action against President, who was judgment-proof; (5) Dorsey threatened that the bank lender/participants would lose their claims against the Tribe if they asserted malpractice against Dorsey; and (6) Dorsey's assertion that it concluded prior to closing that NIGC approval of the Pledge Agreement was not required is fabricated. The Court declines to address this assertion because it is irrelevant to the Court's conclusions.

exercise reasonable care is negligence even if done in good faith. *Wartnick v. Moss & Barnett*, 490 N.W.2d 108, 113 (Minn. 1992). Generally, expert testimony is required to establish the "standard of care applicable to an attorney whose conduct is alleged to have been negligent, and further to establish whether the conduct deviated from that standard." *Jerry's Enters.*, 711 N.W.2d at 817 (quoting *Admiral Merchs.*, 494 N.W.2d at 266).

First, the Court finds that Dorsey was negligent in handling the NIGC approval issue. The Court finds that, unlike the bankruptcy court and Dorsey's contentions, an assessment of whether the Pledge Agreement required NIGC approval need not be made in order to determine the standard of care that Dorsey was required to follow in relation to advising its client, Miller & Schroeder. In other words, whether Dorsey was correct in its determination that NIGC approval was required or not is irrelevant.[48]

What is relevant is that, at the time of closing, Dorsey knew from the NIGC communications that the NIGC wanted to review both the Pledge Agreement and the Amendment. Dorsey also knew that the NIGC had not approved either document, nor had the NIGC confirmed that approval was not needed through a declination letter. Dorsey also knew that without approval, if approval was required, the documents would

---

[48]    The bankruptcy court found that "[a]s a matter of regulatory law, the [Pledge Agreement] was an assignment of a management agreement and a change in a person with a financial interest in the management contract, and void." (App at 212-13.) Because the evidence supports finding that Dorsey violated the standard of care regardless of the outcome of the NIGC review of the Pledge Agreement, the Court need not make a determination as to whether NIGC approval was in fact required or not. Nonetheless, the Court finds merit in the bankruptcy court's analysis as to whether the Pledge Agreement was an assignment or a change in person with a financial interest in the management contract.

be considered void.  Moreover, Rindels, Karns, and Boylan acted as though NIGC

approval was needed and commented on the immediacy of the need for such approval

before closing.  Miller & Schroeder also acted as if NIGC approval was needed, which is

evidenced through the salient data sheet that it provided Dorsey for the St. Regis II loan,

which stated that NIGC approval was a requirement to funding.  And both the NIGC

communications and the briefs submitted herein show that NIGC approval was

potentially necessary, therefore negating any assertion that the issue was remote or

inconceivable.[49]  Under these facts, the degree of care that was reasonable under the

circumstances required Dorsey to wait to see whether the NIGC agreed with its position

or whether it disagreed, or at a minimum, to advise Miller & Schroeder that it should wait

for such communication from the NIGC before closing.  Bremer and the Trustee's

experts confirm that this was the standard of care that Dorsey should have adhered to in

regard to its actions and advice prior to closing.[50]  This is not a case in which Dorsey is

---

[49]     In fact, such assertion by Dorsey is without merit.  Here, Jarboe made his alleged
determination that approval was not needed, which was supposed to be absolute as to this
complex issue, after only a couple hours on the file.  Further, Jarboe has authored a law
review article regarding Tribal business transactions, wherein he devotes a section to
"Federal Approval of Contracts" and states, "Due to the severe consequences of violating
the Section 81 requirement, if there is any doubt as to whether a particular contract falls
within the terms of Section 81, serious consideration should be given to seeking approval
of the contract from the BIA."  Mark A. Jarboe, *Fundamental Legal Principles Affecting
Business Transactions in Indian Country*, 17 Hamline L. Rev. 417, 431 (1993-1994).
Jarboe's advice aptly applies to the situation here—Dorsey should have obtained NIGC
approval or at least waited for an approval or a declination letter.

[50]     Zenas Baer, a former General Counsel to the White Earth Band of Chippewa,
whom the bankruptcy court found qualified as an expert and credible, testified that
Dorsey should have advised the lender that the only assurance of protection of rights was
(Footnote Continued on Next Page)

contending that it advised its client to wait.  Instead, Dorsey concedes that it did not tell

Miller & Schroeder to abort the closing.  Because Dorsey did not advise Miller &

Schroeder to wait, Dorsey breached its duty and was therefore negligent.[51]

When Miller & Schroeder retained Dorsey on Bremer's behalf to pursue collection

under the loans against President, Dorsey knew that several of its attorneys had acted as if

NIGC approval was necessary, and knew that it had not yet received approval.  Dorsey

also knew that if approval was required and not obtained, the Pledge Agreement would

---

(Footnote Continued From Previous Page)
to obtain approval of the transaction by the NIGC or to obtain a declination letter.  He
opined that where there was "an inkling that a transaction requires NIGC approval," it
would have been prudent to follow the NIGC bulletins suggesting that management
contracts, including financing documents, be submitted to the NIGC for review and "to
advise a client to wait until after NIGC reviews the documents."  (Tr. Vol. III at 244-47.)
In addition, Neil Hamilton, Director of the Center for Ethical Leadership in the
Professions, University of St. Thomas Law School, relied on expert Michael Cox, a
former General Counsel of the NIGC, who was expected to testify that "the standard of
care required (1) that Dorsey identify and explain to its clients the risks of closing before
obtaining an NIGC determination on the Pledge; [and] (2) that Dorsey advise a prudent
course of action, including waiting for an NIGC determination as to its position on the
Pledge[.]"  (TA 383.)  Hamilton noted that "[n]o evidence has been provided establishing
that Dorsey met the standard of care."  (*Id.*)

[51]     Although not necessary for finding malpractice based on Dorsey's failure to
disclose relevant information to its client, the Court notes that it finds the proximate
cause and damages elements to the underlying negligence action met as well.  Both
Erickson and Brenden testified at trial that had Dorsey advised Miller & Schroeder to
delay closing until the NIGC approval was received, Miller & Schroeder would have
done so.  (Tr. Vol. II at 99; BA 107.)   If the closing would have been postponed, then the
resulting President or Bremer Litigations would not have commenced because either the
Participation Agreements would never have been entered into (if the NIGC disapproved),
or the Tribe would have either talked settlement or restructured the loans (if the NIGC
approved).  Therefore, but for Dorsey's negligence, Miller & Schroeder would not have
had to expend extensive time and money in these litigations.

be void and that Bremer, as a bank lender/participant under the loan transaction, would

have no security under the loan.  Dorsey did not disclose this to Bremer, even though the

information directly concerned the subject matter of Dorsey's retention, and as a result,

its nondisclosure gives rise to Bremer's negligence claim against Dorsey.

"[A]n attorney is under a duty to . . . disclose any material matters bearing upon

the representation of these obligations."  *Rice v. Perl*, 320 N.W.2d 407, 410 (Minn.

1982).  Here, Professor Hamilton testified that the standard of care included a

professional duty to promptly notify a current client of any negligence. [52]   (TA 86.)

Therefore here, the reasonable and prudent thing for Dorsey to do would have been to

advise Bremer of the prior acts, events, and discussions that had taken place regarding the

---

[52]     Hamilton also testified as follows:

> Q:     And based on your knowledge and experience, is it standard of care
> for a lawyer when he or she finds himself under those circumstances [i.e.,
> when a lawyer sees that there may be a good faith, nonfrivolous
> malpractice claim that a client would have against it for advice that the
> lawyer gave] to advise the client to seek the advice of independent counsel,
> to advise the client how to proceed with respect to their representation with
> their lawyer?
>
>             . . . .
>
> A:     Well, these ethics opinions and that New Jersey court opinion state
> specifically – I mean – they lead me to believe that that is what a lawyer
> should do.  If you think that there's a good faith claim against you, you
> should advise the client that independent counsel would be good for them.

(TA 91.)

NIGC approval,[53] as this information could have impacted Bremer's decision to exercise its discretion and control in pursuing President for the collection, and it surely would have impacted Bremer's decision to hire another lawyer.[54]

The Court rejects any assertion by Dorsey that there was no need to pass this information on to its client because it was correct in concluding that approval was not needed. Again, it is unreasonable for Dorsey to believe that because it was confident that it was right as to the approval issue, it could simply bypass the NIGC review process. Contrary to Dorsey's assertion, the evidence indicates that, at a minimum, Dorsey's conclusion could be challenged; there was no way for Dorsey to know if its advice was correct without a determination from the NIGC.

A reasonably prudent lawyer would not satisfy the duty of care by simply reaching his or her own conclusion regarding the regulations under these circumstances. The standard of care required Dorsey to make sure that its analysis was correct by waiting for

---

[53]     If Dorsey truly believed that Bremer was not its client, then the reasonable and prudent thing to do would have been to advise Bremer that Dorsey was not its attorney.

[54]     The bankruptcy court credits Bremer's expert's opinion that it was commercially reasonable for Bremer to rely on Dorsey's legal work in connection with the pre-closing, loan transaction matters, noting that the expert said that "if each loan participant needed to get its own Indian gaming lawyer, they could not have done the deal." (App. 146, n.17.) While not relevant to this decision, the Court questions why any bank would think it would be reasonable to rely on a lender's attorney's work, when the lender is in such a position as Miller & Schroeder was, being an agent for the borrower during the loan transaction period. And further, the Court disagrees with the notion that each bank lender/participant needed to get its own specialized lawyer. Both the expert and the bankruptcy court overlooked the possibility of having one or two lawyers represent the bank lender/participants as a group.

corroborating or confirming assurance from the NIGC.  *See* Wartnick, 490 N.W.2d at 113

("[A] professional must use reasonable care to obtain the information needed to exercise

his or her professional judgment, and failure to use such reasonable care would be

negligence, even if done in good faith."); *Togstad v. Vesely, Otto, Miller & Keefe,* 291

N.W.2d 686, 693 (Minn. 1980) (per curiam) (stating that the case did "not involve mere

error of judgment" where "gist of plaintiffs' claim is that [the attorney] failed to perform

the minimal research that an ordinarily prudent attorney would do" in a similar situation).

Here, Dorsey did not use reasonable care.  Therefore, the second malpractice element is

met.

The Court also finds that the third and fourth elements are satisfied.  Dorsey's

nondisclosure was the proximate cause of Bremer's damages (i.e. litigation expenses),

and but for Dorsey's conduct, Bremer would have obtained a more favorable result in the

underlying transaction.  At no time prior to Bremer's funding of its loan did anyone

inform Bremer that:  (1) NIGC approval of the Amendment was no longer a condition to

closing; (2) NIGC approval of the Pledge Agreement had not yet been obtained; and

(3) that a claim against the Tribe would be fruitless because of the lack of the NIGC

approval.  If Dorsey would have held up the closing for the NIGC approvals, the loan

would not have closed and there would not have been a loan to sell to Bremer.[55]  Further,

---

[55]      *See supra* note 51.  While the Pledge Agreement and Amendment were under
review by the NIGC, the NIGC communicated to President and the Tribe that it may take
up to 60 days to reach a decision on whether to approve the Amendment.  (JSA 175.)
Then, on April 16, 1999, the NIGC wrote to President and the Tribe again, stating that the
Chairman of the NIGC "is not taking action at this time to either approve or disapprove
(Footnote Continued on Next Page)

at no time did Dorsey disclose to Bremer that Dorsey's advice upon closing might have

been improper.[56]  Dorsey's failure to disclose its prior negligence (the negligence being

Dorsey not advising Miller & Schroeder that it should wait for either NIGC approval or a

declination letter from the NIGC before closing), which related directly to the issues

permeating the President and Bremer Litigations, caused Bremer to spend hundreds of

thousands of dollars pursuing the wrong party.  In other words, but for Dorsey's

negligence, Bremer would have obtained a more favorable result, as it would have sued

Dorsey instead of pursuing collection of the loan from President, who was judgment

---

(Footnote Continued From Previous Page)

the [Amendment]."  (JSA 185.)  Under 25 C.F.R. § 535.1(d)(2), "If the Chairman does not approve or disapprove, he shall respond in accordance with the service provisions of part 519 of this chapter noting that no action has been taken on the proposed modification [or assignment, under § 535.2].  The request *shall therefore be deemed disapproved* and the parties shall have thirty (30) days to appeal the decision under part 539 of this chapter." (Emphasis added.)  Because of this disapproval, no action was taken on the Pledge Agreement either.  Therefore, if Dorsey had held up closing, it eventually would have received this notification from the NIGC, which disapproved the Amendment. And the parties would not have closed the loan faced with this disapproval.

[56]     Contrary to Dorsey's assertion, there is evidence that Bremer reasonably relied on Dorsey's legal advice when commencing the legal action against President.  Jensen testified that he believed that Dorsey was representing the bank lender/participants in the President Litigation.  (TA at 151.)  He also testified that he participated in specific discussions with Thomas where litigation status and strategies were discussed and legal advice was given to the participants.  (TA at 152.)  In addition, in the June 29, 2000 Thomas Memo that was sent to the bank lender/participants, Dorsey advised, "In the event that negotiations with either the Borrower or the Tribe do not result in a favorable resolution and repayment terms of the Loans, we would suggest commencing suit in Federal District Court for the District of Minnesota against the Borrower and the Tribe." (App. 746-a.)  Thereafter, when negotiations proved unfruitful, Bremer and the other bank lender/participants approved the commencement of the suit.  And again, even through all of these meetings and communications, Dorsey at no time represented to Bremer that it was not Bremer's attorney.

proof anyway. Therefore, the Court finds that the proximate cause and "but for" elements have been met.[57]

### D.    Attorneys' Fees

The bankruptcy court recommends that the Court award Bremer the return on its $2,000,000 investment and the $409,000 in costs that it incurred in the Bremer Litigation, minus $650,000, which was the amount Bremer was paid in connection with the settlement with the Tribe.  The bankruptcy court also recommends that the Court award prejudgment interest on said sum as calculated pursuant to Minnesota Statute § 549.09, commencing on February 23, 2005, and concluding on the date of entry of judgment.

---

[57]    Dorsey also contends that there is no proximate cause because of a lack of evidence showing that the casino's revenues exceeded operating expenses, therefore triggering the Tribe's repayment obligations.  Dorsey therefore contends that the reason why Bremer did not get paid under the loan was because of a lack of revenues, not because of the lack of NIGC approval.  Bremer contends that the evidence indicates that the casino's revenues had improved (i.e., Park Place offered $9.5 million in 2000 to acquire President's interest in the Management Agreement; the Tribe offered to talk about its financials if someone could provide information that NIGC approval had been received; and the Tribe had a substantial amount of money to offer in settlement of the bank lender/participants' interests in the President Litigation).  Bremer also contends that Dorsey's assertion is irrelevant because under the Pledge Agreement, the Tribe pledged that it had an obligation to pay the expenses unconditionally, which was a modification of the Tribe's repayment obligations under the Management Agreement.  Therefore, Bremer contends that had the Pledge Agreement been approved by the NIGC, Bremer would have been able to receive payment from the Tribe, regardless of President's default in not properly documenting or verifying its expenses.

Although the record does show that the casino's revenues had improved, and therefore, the casino likely had revenues to trigger its repayment obligations if the Pledge Agreement had been approved, Dorsey's argument is a red herring.  Even if the casino had no revenues, the President and Bremer Litigations would have ensued nonetheless because the Tribe continued to assert that it would not make payment or provide financials until NIGC approval had been obtained.

After *de novo* review of the record and the parties' submissions, the Court agrees with the bankruptcy court's recommendation as to the $409,000 in costs that Bremer incurred in the Bremer Litigation and as to the award of prejudgment interest.  However, because the attorney-client relationship between Dorsey and Bremer was not established until June 2000, Bremer does not have a claim for damages based on Dorsey's negligence or on any conduct by Dorsey that occurred prior to closing when Bremer was not its client.  Therefore, the Court declines to award Bremer a return on its $2,000,000 investment.[58]

D.W.F.

# APPEAL

## DISCUSSION

## I.      Standard of Review

A district court reviews findings of fact in a bankruptcy court's judgment or order based on a clear-error standard.  *In re MBA Poultry, L.L.C.*, 291 F.3d 528, 533 (8th Cir. 2002).  A district court reviews a bankruptcy court's conclusions of law *de novo*.  *Id.*  "A finding is clearly erroneous if it lacks substantial evidence to support it, or if, even when there is evidence to support the finding, the reviewing court on the entire evidence is left

---

[58]    The $650,000 that was paid in connection with the settlement with the Tribe is an amount to be credited against any future return on Bremer's $2,000,000 investment, not against the $409,000 in costs that it incurred in the Bremer Litigation, which is awarded here.

with the definite and firm conviction that a mistake has been made."  *Day v. Johnson*,

119 F.3d 650, 654 (8th Cir. 1997) (citation omitted).

## II.     Breach of Fiduciary Duties

Minnesota law requires that when an attorney-client relationship is established, an

"attorney is under a duty to represent the client with undivided loyalty, to preserve the

client's confidences, and to disclose any material matters bearing upon the representation

of these obligations."  *Rice*, 320 N.W.2d at 410; *see also STAR Ctrs., Inc. v. Faegre &

Benson*, 644 N.W.2d 72, 77 (Minn. 2002) ("It is the undoubted duty of an attorney to

communicate to his client whatever information he obtains that may affect the interests of

his client in respect to matters entrusted to him.") (quotations omitted); *Commercial

Assocs., Inc. v. Work Connection, Inc.*, 712 N.W.2d 772, 779 (Minn. Ct. App. 2006)

("Minnesota law imposes on a fiduciary the highest obligation of good faith, loyalty,

fidelity, fair dealing, and full disclosure of material matters affecting the client's

interests.").  The bankruptcy court found that Dorsey did breach its fiduciary duties to its

clients, and Dorsey appealed.

### A.     Duty of Undivided Loyalty and Duty to Disclose Conflict of Interest

The bankruptcy court held that an attorney-client relationship was formed between

Bremer and Dorsey in June 2000, and because Bremer was Dorsey's client in the

President Litigation, the representation of Miller & Schroeder against Bremer in the

Bremer Litigation was a breach of fiduciary duty of undivided loyalty.  The bankruptcy

court also found that when Dorsey was presented with the situation of dual loyalty, it

breached the fiduciary duty of disclosure by not disclosing the conflict to Miller &

Schroeder and Bremer and by not seeking consent to proceed from both.  Dorsey argues that the bankruptcy court's finding is erroneous because according to Dorsey, Bremer was not Dorsey's client at any time and therefore no conflict of interest existed in Dorsey's representation of Miller & Schroeder in the Bremer Litigation.  Additionally, Dorsey contends that it had no duty to disclose.

After viewing the record, the Court finds that the bankruptcy court did not clearly err in concluding that Bremer was Dorsey's client as of June 2000.  As explained above in addressing the bankruptcy court's Report and Recommendation, the existence of an attorney-client relationship is "usually a question of fact dependent upon the communications and circumstances." *Admiral Merchs.*, 494 N.W.2d at 265.  Here, Bremer and Miller & Schroeder agreed in the Participation Agreement to have Miller & Schroeder retain an attorney on behalf of the bank lender/participants in the event that it would need to pursue collection.  Miller & Schroeder did pursue collection and retained Dorsey on its and the bank lender/participants' behalf.  In addition to the agreement, both Dorsey and Miller & Schroeder's communications starting in June 2000, and the way in which the parties were behaving at that time, support the bankruptcy court's finding that an attorney-client relationship existed between Dorsey and Bremer.  (*See also supra* Report and Recommendation Memorandum, Section III.B.1.b.)

As to the bankruptcy court's finding that Dorsey breached its fiduciary duties of loyalty and full disclosure, Dorsey contends that the bankruptcy court erred in basing its decision on the Minnesota Rules of Professional Conduct instead of common law.  Dorsey has misread the bankruptcy court's decision.  The bankruptcy court based its

decision on common law fiduciary obligations.  (*See* App. 233, citing applicable case

law.)  The bankruptcy court used the Rules of Conduct only for guidance.  (*See* App.

233-34.)  The Court agrees with the bankruptcy court and the Trustee in that an attorney's

violation of provisions of the Rules of Professional Conduct can inform the court's

decision on whether a breach has occurred.[59]

The bankruptcy court relied on Professor Hamilton's opinion that Dorsey's actions

violated the Minnesota Rules of Professional Conduct, specifically Rule 1.7.  That rule

stated:

> A lawyer shall not represent a client if the representation of that client will
> be directly adverse to another client, unless:  (1) the lawyer reasonably
> believes the representation will not adversely affect the relationship with
> the other client; and (2) each client consents after consultation.

Minn. R. Prof. Conduct 1.7(a).[60]  Hamilton testified that there was a conflict of interest

making Rule 1.7(a) applicable.  Specifically, Hamilton stated that "the conflict was that

[Dorsey was] on the opposite side of a current client in a closely related matter.  It was

representing Miller & Schroeder and the bank participants in the President R.C. matter

and now it's on the opposite side of Bremer in the Bremer versus Miller & Schroeder

action."  (TA 81.)  Hamilton concluded that because of this conflict, Dorsey had the duty

---

[59]     *See Restatement (Third) of Law Governing Lawyers* § 1, cmt. B ("[C]ourts have
held that lawyer-code provisions may be relevant in determining . . . a lawyer's fiduciary
duty to a client[.]").

[60]     Minn. R. Prof. Conduct 1.7 was later amended in 2005.

to disclose the conflict to both Miller & Schroeder and Bremer and to seek the consent of both clients in order to proceed.[61]  (TA 83.)  Dorsey did not do this.

Based on the facts of this case, the relevant fiduciary duty common law, and the testimony of Hamilton, the Court finds that the bankruptcy court did not clearly err in concluding that Dorsey breached its fiduciary duties of loyalty and full disclosure when it agreed to represent Miller & Schroeder in its defense against Bremer in the Bremer Litigation and when it did not disclose the conflict nor seek consent from both parties. Therefore, the Court affirms the bankruptcy court's conclusion to that effect.

### B.    Duty to Disclose a Possible Malpractice Claim

The bankruptcy court also found that Dorsey breached a fiduciary duty when it did not advise Miller & Schroeder that it may have a malpractice claim against Dorsey

---

[61]    In addition, Dorsey's expert, Charles Lundberg, agreed that if Bremer was Dorsey's client during the President Litigation, then Dorsey had a conflict of interest in representing Miller & Schroeder against Bremer in the Bremer Litigation:

> Q:    And Mr. Lundberg you would agree with me that if Bremer was a client in the President RC case that it would have been a conflict for Dorsey to defend Miller & Schroeder in the Bremer case, true?

> A:    If Bremer were a client in the President case of Dorsey it would have been a 1.7 conflict for Dorsey to be adverse to Bremer in the later lawsuit, yes.

> Q:    And the reason for that is because Dorsey would be directly adverse to a current client, true?

> A:    Under those facts, yes.

(TA 173.)

because of Dorsey's advice to close the loans rather than wait for a communication from the NIGC regarding approval of the Pledge Agreement. Dorsey's primary argument for clear error here is based on the assertion that it did not commit malpractice because its advice that the Pledge Agreement did not require NIGC approval was correct advice. After reviewing the record, the Court concludes as the bankruptcy court did that there is a breach, but the Court bases its finding on Dorsey's failure to wait, or at a minimum, on Dorsey's failure to advise Miller & Schroeder to wait, for either an approval or a declination letter from the NIGC. Thus, it is irrelevant whether Dorsey's advice was correct.

Again, the bankruptcy court used the Rules of Conduct as a guide, and relied on both Hamilton's testimony and the facts. Rule 1.7(b) stated the following:

> A lawyer shall not represent a client if the representation of that client will be materially limited by . . . the lawyer's own interests, unless: (1) the lawyer reasonably believes the representation will not be adversely affected; and (2) the client consents after consultation.

Minn. R. Prof. Conduct 1.7(b).[62] And Rule 1.4 required a lawyer to keep their client reasonably informed about matters so that the client could make intelligent decisions with respect to the representation:

> (a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.
> (b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

---

[62]    Minn. R. Prof. Conduct 1.7 was later amended in 2005.

Minn. R. Prof. Conduct 1.4.[63]  In Professor Hamilton's opinion, Dorsey violated both

Minnesota Rules of Professional Conduct 1.7(b) and 1.4 and breached its fiduciary duty

by failing to disclose all of the facts and analysis relating to the potential malpractice

claim and in continuing its representation even after Dorsey's own interests became

involved.  The Court agrees.

"It is the undoubted duty of an attorney to communicate to his client whatever

information he obtains that may affect the interests of his client in respect to matters

entrusted to him."  *Star Ctrs.*, 644 N.W.2d at 77.  "Materiality is ordinarily a question of

fact."  *Id*.  If the information obtained by an attorney is the knowledge of a substantial

malpractice claim against that attorney, the attorney must disclose that to the client.  *See*

*Restatement (Third) of Law Governing Lawyers* § 20, comment c ("If the lawyer's

conduct of the matter gives the client a substantial malpractice claim against the lawyer,

the lawyer must disclose that to the client.").  Here, the potential malpractice claim was

both material and substantial because Dorsey's decision to proceed without either NIGC

approval or a declination letter directly affected the enforceability of the loans, and

Dorsey's decision to not disclose its equivocal approach to its decision resulted in several

unnecessary and expensive litigations.

Dorsey's argument—that because its advice was correct there could not have been

malpractice—misses the point.  Here, where a regulatory body was created to oversee the

Indian gaming industry, and specifically where that regulatory body is assigned to review

---

[63]     Minn. R. Prof. Conduct 1.4 was later amended in 2005.

and approve certain casino management contracts and related agreements, whether

Dorsey was ultimately correct or not is irrelevant to the malpractice; instead, the issue is

whether Dorsey allowed that regulatory body to do its job.  In other words, the standard

of care required that Dorsey allow the NIGC to conduct and finish its review of the

Pledge Agreement and advise its client to delay closing until such review was

concluded.[64]  (*See supra* Report and Recommendation Memorandum, Section III.C.)

Because Dorsey did not do so, there was a possible malpractice claim for Dorsey to

disclose.

As to whether Dorsey breached its fiduciary duty, the question then becomes

whether Dorsey realized this possible claim and if it did, whether Dorsey disclosed the

claim to its clients.  The answer to the former is "yes," and to the latter is "no."  The

bankruptcy court properly relied on circumstantial record evidence to find that Dorsey

knew there was a possible malpractice claim.  Such evidence included Rindels, Karns,

Boylan, and Jarboe's knowledge that NIGC approval might be necessary.  Specifically,

Jarboe testified that he knew on or before January 21, 1999, that the Pledge Agreement

did not need NIGC approval.  However, prior to closing, after Karns presented Rindels

---

[64]     Therefore, the cases Dorsey cites are factually distinguishable.  *See Trout Creek Props., LLC v. Akerman, Senterfitt & Eidson, P.A.*, 294 F. Supp. 2d 1280, 1291 (M.D. Fla. 2003); *Smith v. St. Paul Fire & Marine Ins. Co.*, 366 F. Supp. 1283, 1290 (M.D. La. 1973); *Komar Indus., Inc. v. Thompson, Hine & Flory, LLP*, Nos. 02CVA02-1245, 04CVA07-7101, 2005 WL 1413348 (Ohio Ct. Com. Pl. May 25, 2005); *McCarty v. Browning*, 797 So. 2d 30, 31 (Fla. Dist. Ct. App. 2001).  None of these cases dealt with advice that hinged on something that was left to the discretion of a regulatory commission, and none of them presented a situation where there were reasonable grounds for the attorney to believe that his advice was questionable.

with his research results on NIGC approval and after the NIGC had reported to Karns that it wanted to review the loan documents, Rindels questioned whether NIGC approval was needed for the Pledge Agreement.  Then, when asked for her opinion on what to do regarding NIGC approval, Boylan stated to the group that "if there is any doubt we must wait."  (TA 319.)  Rindels and Boylan are experienced lawyers, one of whom was intricately involved in the drafting of the documents in question, and the other had known expertise in matters having to do with the NIGC and IGRA.  Both were acting as though the answer to whether NIGC approval was needed was not clear-cut.

Further, Rindels then acted as though NIGC approval was needed, through and after closing.  For example, Rindels e-mailed Karns (copying Jarboe) just hours before closing stating that Dorsey wanted the NIGC review to proceed, "especially for the Notice of Pledge."  (TA 321.)  Additionally, after closing, she sent several letters to President asking for the status of the approval.  (BA 164, 169, 171.)  Therefore, several of the Dorsey lawyers questioned whether NIGC approval was necessary prior to closing, and some of the Dorsey lawyers acted as if approval was needed both before and after closing.  The fact that one Dorsey partner, Jarboe, concluded otherwise does not negate Dorsey's realization of the tension between the two conclusions, especially when some of the attorney's continued to act as though approval was needed even after Jarboe asserted his position.

Even if the malpractice (by following Jarboe's advice) was not clear to Dorsey at that time, it should have been by October 3, 2000.  On that day, the Tribe voiced its opinion that the Pledge Agreement was unenforceable because of the lack of NIGC

approval.  This is further evidence that there was a reasonable basis for questioning

Jarboe's prior advice.  And certainly at this point, Dorsey knew that its prior advice was

questionable, and that a possible malpractice claim could be brought against it based on

its failure to wait for either NIGC approval or a declination letter.[65]

The next question therefore becomes whether Dorsey disclosed the known

possible malpractice claim to its clients.  Even though the Court finds that the nature of

the possible malpractice claim is different than that declared by the bankruptcy court, the

Court agrees with the bankruptcy court's conclusion that Dorsey did not disclose the

known possible malpractice claim to its clients.

Dorsey asserts that it had no duty to disclose because Miller & Schroeder was

aware of the material facts; in other words, Dorsey asserts that it only needed to make

sure its client knew the facts, not causes of action.  Dorsey is incorrect.  As Hamilton

testified, the required disclosure included a full analysis of all potential claims, defenses,

and strategies that the client may have, including discussing the potential for

commencing a malpractice action against the retained attorney.  *See Matter of Discipline*

*of Schmidt*, 402 N.W.2d 544, 550 (Minn. 1987) ("[T]he attorney has the affirmative

obligation before taking a liability release from a client to advise the client of the client's

---

[65]  Hamilton opined that the duty to disclose the malpractice arose as early as June 2000, when Thomas and Rindels discussed the facts surrounding the loan transaction. For sure, Hamilton opined that the disclosure should have happened after the October 2000 meeting with the Tribe wherein the Tribe identified the problem with the NIGC approval.  Hamilton also opined that the disclosure could also have happened when Dorsey received Bremer's draft complaint in the Bremer Litigation, as it was then made clear that Bremer was placing some fault on Dorsey.  The Court agrees.

right to seek other counsel and to advise the client as to the nature and existence of any potential claim."); *see also Circle Chevrolet Co. v. Giordano, Halleran & Ciesla*, 662 A.2d 509, 514 (N.J. 1995) ("[A]n attorney who realizes he or she has made a mistake must immediately notify the client of the mistake as well as the client's right to obtain new counsel and sue the attorney for negligence."), *overruled on other grounds*, *Olds v. Donnelly*, 696 A.2d 633, 643 (N.J. 1997); *Tallon v. Comm. On Prof'l Standards*, 447 N.Y.S.2d 50, 51 (1982) ("An attorney has a professional duty to promptly notify his client of his failure to act and of the possible claim his client may thus have against him.").[66]  Here, proper disclosure therefore required the disclosure of all documentation relevant to Dorsey's decision on NIGC approval, a full statement of how the decision was made, a disclosure of who participated in the decision, and an explanation of what impact these facts might have on the on-going litigation.

Thus, while Miller & Schroeder may have known that Jarboe believed that NIGC approval was not required and that the Tribe believed that it was, Miller & Schroeder did not know that others at Dorsey believed or were acting as though NIGC approval was required, contrary to Jarboe's advice.  Therefore, Dorsey did not fully disclose all

---

[66]     The Court also finds the New Jersey, Wisconsin, and New York Ethics Opinions that are cited by Hamilton and relied on by the bankruptcy court persuasive.  (*See* App. 226-27.)  *See also* 2 Mallen, Ronald E. & Jeffrey M. Smith, *Legal Malpractice* § 14.22 (2007 ed.) ("A corollary of the fiduciary obligations of undivided loyalty and confidentiality is the attorney's responsibility to promptly advise the client of any important information that may impinge on those obligations.  This means that there must be complete disclosure of all information that may bear on the quality of the attorney's representation.  The disclosure must include not only all material facts but also should include an explanation of their legal significance.").

information that would affect its representation of Miller & Schroeder, nor did it explain the legal significance of the situation.  Specifically, Dorsey did not disclose that a non-frivolous, malpractice claim had surfaced.[67]  Because this information was material to the representation of its clients, Dorsey breached its duty of disclosure.  *See Rice*, 320 N.W.2d at 410.  For the reasons stated above, the Court finds that the bankruptcy's conclusions to this effect are not clearly erroneous.[68]

### C.    Waiver

Dorsey argues that Miller & Schroeder and Bremer waived both fiduciary duty claims.  The bankruptcy court found that no waiver existed as to either claim.  Dorsey argues that the bankruptcy court clearly erred.

First, Dorsey contends that Miller & Schroeder waived any breach of fiduciary duty claim based on loyalty or nondisclosure of a conflict of interest because neither Miller & Schroeder nor Bremer objected to Dorsey's representation of Miller &

---

[67]    Likewise, Dorsey also failed to disclose this information to Marshall when Marshall was appointed as Miller & Schroeder's agent to service the loans under the participation agreements.

[68]    Dorsey also contends that a third-party malpractice claim by Miller & Schroeder seeking indemnity from Dorsey in the Bremer litigation was not viable because Dorsey's advice on the approval issue did not force Miller & Schroeder to commit the alleged fraud, which was based on Miller & Schroeder telling Bremer that NIGC approval of the Pledge Agreement had been obtained.  The Court agrees with the Trustee and the bankruptcy court.  A third-party malpractice claim was viable because Dorsey was advising Miller & Schroeder that it expected the NIGC to approve the agreements or declare such approval unnecessary.  But even if a third-party claim had not been viable, a general malpractice claim by Miller & Schroeder against Dorsey would have been.  (*See supra* Report and Recommendation Memorandum, Section III.C.)  If Miller & Schroeder had known of this potential claim early on, it might have made different decisions in the President and Bremer Litigations.

Schroeder in the Bremer Litigation.  Dorsey asserts that if an attorney-client relationship existed between Dorsey and Bremer prior to the Bremer Litigation, Miller & Schroeder was aware of it because it was intricately involved in the President Litigation.  Similarly, Dorsey contends that if Bremer thought Dorsey was representing it in the President Litigation, then Bremer waived the subsequent conflict by not objecting to it.  Finally, Dorsey contends that the bankruptcy court's finding must be reversed because it improperly relied on the Minnesota Rules of Professional Conduct as the basis for its finding.

First, the Court finds that the bankruptcy court's use of the Minnesota Rules of Professional Conduct was proper.  Again, the court used the rules as a guide, while relying on common law.  (App. 231-33.)  Second, the cases Dorsey cites are inapposite. Here, a disqualification motion was never made because the clients did not know and understand the conflict, and even so, this is not a situation where one party desires to disqualify the opposing party's attorney based on a conflict of interest.  Instead, this is a situation in which a party has sought liability against its own attorneys for the attorneys' failure to disclose a potential conflict of interest.

Lastly and most importantly, even after considering Dorsey's contentions, it is undisputed that Dorsey never disclosed the possible conflict of interest to Miller & Schroeder, and it never asked for consent from either party to proceed as Miller &

Schroeder's attorney.[69]   In order for a client to waive a conflict of interest, there must be

informed consent.  *See In re McGregory*, 340 B.R. 915, 922 n.20 (8th Cir. B.A.P. 2006)

("[T]he standard for such waiver is whether the waiver of conflict was given after

consultation and full disclosure of the potential risks; in order for informed consent to be

valid, a lawyer must prove by clear proof that his adverse interest was disclosed to the

client and was perfectly understood; such consent must be knowing, intelligent, and

voluntary.") (citing *Union Planters Bank v. Kendrick*, 142 S.W.3d 729, 739 (Mo. 2004));

*Citizens Nat'l Bank of Madelia v. Mankato Implement Inc.,* 441 N.W.2d 483, 487 (Minn.

1989) (stating that waiver must be based on an "intentional relinquishment of the known

right" on the disclosed facts); *see also Image Tech. Servs., Inc. v. Eastman Kodak Co.*,

820 F. Supp. 1212, 1216-17 (N.D. Cal. 1993) ("To satisfy the requirement of full

disclosure by a lawyer before undertaking to represent two conflicting interests, it is *not*

*sufficient that both parties be informed of the fact that the lawyer is undertaking to*

*represent both of them, but he must explain to them the nature of the conflict of interest in*

*such detail so that they can understand the reasons why it may be desirable for each to*

*have independent counsel*, with undivided loyalty to the interests of each of them.")

(emphasis in original; quotations omitted).  Here, Miller & Schroeder was not fully

informed because Dorsey never explained the nature of the conflict to it.

    The fact that the client knows of a conflict is not enough to satisfy the attorney's

duty of full disclosure.  *Florida Ins. Guar. Ass'n Inc. v. Cary Canada, Inc.*, 749 F. Supp.

---

[69]    There is also no evidence in the record showing that Miller & Schroeder was in
fact aware of the conflict.

255, 259 (S.D. Fla. 1990) ("Consent can only come after consultation – which the rule contemplates as full disclosure . . . . [I]t is not sufficient that both parties be informed of the fact that the lawyer is undertaking to represent both of them, but he must explain to them the nature of the conflict of interest in such detail so that they can understand the reasons why it may be desirable for each to [withhold consent].") (quoting *Unified Sewerage Agency, Etc. v. Jelco, Inc.*, 646 F.2d 1339, 1345-46 (9th Cir. 1981)); *see also British Airways, PLC v. Port Authority of N.Y. and N.J.*, 862 F. Supp. 889, 900 (E.D.N.Y. 1994) (stating that the burden is on the client's attorney to fully inform and obtain consent from the client); *Kabi Pharmacia AB v. Alcon Surgical, Inc.*, 803 F. Supp. 957, 963 (D. Del. 1992) (stating that evidence of the client's constructive knowledge of a conflict would not be sufficient to satisfy the attorney's consultation duty); *Manior-Electroalloys Corp. v. Amalloy Corp.*, 711 F. Supp. 188, 195 (D.N.J. 1989) ("Constructive notice of the pertinent facts is not sufficient.").  A client is not responsible for recognizing the conflict and stating its lack of consent in order to avoid waiver. *Manior-Electroalloys*, 711 F. Supp. at 195.  The lawyer bears the duty to recognize the legal significance of his or her actions in entering a conflicted situation and fully share that legal significance with clients.  Here, Dorsey did not even attempt disclosure, nor did it seek consent.   Therefore, the Court finds that the bankruptcy court did not clearly err in concluding that there was no waiver of Miller & Schroeder or Marshall's breach of fiduciary duty claim based on Dorsey's duties of loyalty and disclosure of a conflict of interest.

Dorsey also contends that Miller & Schroeder waived any breach of fiduciary duty claim based on Dorsey's nondisclosure of a possible malpractice claim.  In support of this assertion, Dorsey contends that Miller & Schroeder knew or was aware of the material facts regarding Dorsey's advice on the approval issue, and nonetheless chose to both retain Dorsey and refrain from filing a malpractice claim against Dorsey.  The Court disagrees.

As explained above in Section II.B., Dorsey did not fully disclose all of the material information regarding its decision on NIGC approval and made no disclosures as to the viability of a malpractice claim based on its prior advice.  Dorsey's duty of disclosure extends beyond the hope that the client recognizes the significance of the facts presented.  *See Citizens Nat'l Bank,* 441 N.W.2d at 487 (stating that waiver must be based on an "intentional relinquishment of the *known right*" on the disclosed facts) (emphasis added).  Moreover, even if Miller & Schroeder discovered some of the facts on its own, constructive notice of the facts is not sufficient to meet Dorsey's duty of full disclosure.  Therefore, the Court finds that the bankruptcy court did not clearly err in concluding that there was no waiver of the breach of fiduciary duty claim based on Dorsey's nondisclosure of the possible malpractice.

### D.    Fee Disgorgement

The bankruptcy court found that Dorsey's actions constituted a blatant conflict of interest and concluded that fee disgorgement is appropriate.  Specifically, the court found that reimbursement is just because:  (1) Dorsey failed to disclose material information to its client despite having ample opportunity spanning several years to disclose such

information; (2) Dorsey chose not to disclose material information in order to protect itself; and (3) Dorsey's clients engaged in unnecessary, expensive, and time-consuming litigation because of Dorsey's nondisclosure.  The bankruptcy court found such conduct evidenced bad faith and ordered judgment against Dorsey in the amount of $887,444.20—$550,499.60 for the attorney's fees and expenses Miller & Schroeder paid Dorsey in the Bremer Litigation, $285,844.72 for the attorney's fees and expenses that Miller & Schroeder paid Dorsey in the President Litigation, $51,099.88 for the attorney's fees and expenses Marshall paid Dorsey in the Bremer Litigation, and $45,916.29 for the attorney's fees and expenses Marshall paid Dorsey in the President Litigation, plus prejudgment interests on said sums calculated by Minn. Stat. § 549.09, commencing on October 3, 2003, and concluding on the date of entry of judgment.

Dorsey argues that the bankruptcy court's finding is clearly erroneous because, according to Dorsey, the evidence does not support a finding of bad faith.  Dorsey relies on the same assertions that it did in challenging the bankruptcy court's breach of fiduciary duties and malpractice findings.  For example, Dorsey asserts that Bremer was not its client and thus, no breach of fiduciary duty occurred, and that Miller & Schroeder waived any breach because it was aware of the alleged representation of Bremer in the President Litigation but did not object.  Dorsey also asserts that it did not need to disclose any alleged malpractice because it did not commit malpractice.  Dorsey asserts that it believed approval was not needed, advised Miller & Schroeder of this, and its advice was correct.  Dorsey also asserts that Miller & Schroeder was aware that the Tribe and

Bremer both challenged Dorsey's stance on the approval issue.[70]   Based on these facts,

Dorsey contends there is no evidence of bad faith.

The Court concludes that the bankruptcy court did not clearly err in finding that

total fee disgorgement is appropriate.  The bankruptcy court properly relied on *Gilchrist*

*v. Perl*, 387 N.W.2d 412 (Minn. 1986); *Rice v. Perl*, 320 N.W.2d 407 (Minn. 1982); and

*In re Lee's Estate*, 9 N.W.2d 245 (Minn. 1943), and correctly analyzed the facts in this

case to the extent that it found a breach of faith.

In *Rice*, the Minnesota Supreme Court reaffirmed that "an attorney (or any

fiduciary) who breaches his duty to his client forfeits his right to compensation."  *Rice*,

320 N.W.2d at 411.

> It is equally well settled that an attorney at law who is unfaithful in the
> performance of his duties forfeits his right to compensation.  An attorney is
> an officer of the court, sworn to aid in the administration of justice and to
> act with strict fidelity to both his clients and the courts.  Unquestioned
> fidelity to their real interests is the duty of every attorney to his clients.
> When a breach of faith occurs, the attorney's right to compensation is
> gone.

*Id*. (quoting *In re Lee's Estate*, 9 N.W.2d at 251).  In *Rice*, the court found that even

without evidence of overt wrongful conduct, forfeiture of attorneys' fees was appropriate,

stating, "the law has traditionally been unyielding in its assessment of penalties when a

fiduciary, or trustee, or agent has breached any of his obligations.  The underlying policy

is a strong one.  It recognizes that insuring absolute fidelity to the principal's (or

---

[70]     To the extent that Dorsey raises issues already discussed by the Court in this
opinion, the Court refers back to its previous analysis.

beneficiary's) interests is fundamental to establishing the trust necessary to the proper functioning of these relationships." *Id*.

Consistent with *Rice* and *In re Lee's Estate*, if the breach involves bad faith, the attorney forfeits all rights to compensation. *Gilchrist*, 387 N.W.2d at 417. "Where there is no actual fraud or bad faith, where there is no actual harm to the client, and where the breach involves multiple potential plaintiffs, the attorney's forfeiture may be scaled to an amount commensurate with the misconduct by applying the factors used to determine punitive damages as listed in Minn. Stat. §549.20, subd. 3[.]" *Fiedler v. Adams*, 466 N.W.2d 39, 43 (Minn. Ct. App. 1991) (citing *Gilchrist*, 387 N.W.2d at 417). Determining bad faith is a question of fact. *See id.*

Here, the Court finds there is evidence of bad faith. Dorsey knew of a potential malpractice claim against itself based on its prior advice regarding NIGC approval and it simply chose not to disclose this potential claim to its clients. Moreover, even if Dorsey was not sure about the viability of this malpractice claim, it chose not to further investigate the claim. Instead, it rested on Jarboe's belief that he was right. After the potential malpractice claim was realized, Dorsey continued its representation of Miller & Schroeder for years, knowing that Miller & Schroeder had a possible claim against it, and chose not to disclose that claim to its clients in its own self-interest. Dorsey's self-interest is further evidenced in the record. For example, Dorsey stated its intention to try to "keep all this within the firm." (App. 825.) At one point, Dorsey even shifted blame onto its client by asserting that it was Miller & Schroeder who concluded that NIGC approval was not needed with respect to the loan documents, and that Dorsey merely

concurred with that decision.  But the evidence, including the testimony of Dorsey's own attorneys, does not support this assertion.  Dorsey's decision to not disclose the possible conflict of interest[71] and the potential malpractice claim were directly contrary to the interests of its client and constituted a breach of faith.  Such evidence is sufficient evidence of Dorsey's bad faith.  Therefore, the Court finds that the bankruptcy court did not clearly err in concluding that full fee disgorgement is appropriate.[72]

---

[71]    At a minimum, Dorsey knew of a potential or perceived conflict of interest by Bremer.

[72]    Dorsey's other arguments fail as well.  First, Dorsey contends that there is no evidence that anyone at Dorsey concluded that Dorsey's advice was wrong.  This is not accurate.  Rindels, Boylan, and Karns all acted as though NIGC approval was needed, or at a minimum, acted as though they should wait for either an approval or a declination letter before proceeding with the closing.  In addition, Rindels continued to press the issue even after closing, which shows that she believed Jarboe's advice was wrong.

Second, Dorsey contends that Miller & Schroeder waived its right to disgorge fees by failing to object to a conflict in Dorsey's representation and by choosing to retain Dorsey in the Bremer Litigation after it knew that the Tribe and Bremer disagreed with Dorsey's position.  Just as Dorsey's argument as to waiver failed above in Section II.C., the argument fails here as well.

Third, Dorsey contends that the bankruptcy court erred in including the $90,000 in fees from the Bremer Litigation that were paid for Dorsey to defend Erickson and Frank, asserting that Dorsey had no conflict in representing Erickson and Frank.  The Court finds no clear err in including the $90,000 in the full fee forfeiture, as Dorsey breached its duty of full disclosure to all of its clients.

Finally, Dorsey contends that obtaining favorable results for Miller & Schroeder in the President Litigation indicates that there was no bad faith or fraudulent conduct on Dorsey's part.  The Court finds that whatever benefit Dorsey obtained for Miller & Schroeder through the subsequent litigations is irrelevant here, as what is considered favorable to Miller & Schroeder and Bremer is subjective.  Neither party has been made whole at this point.  Nonetheless, in a fee disgorgement analysis, "the client is deemed
(Footnote Continued on Next Page)

**CONCLUSION**

After spending months pouring through the record, including all exhibits, briefs, and transcripts, the Court is discouraged that this case has come to its present state. This entire course of events was entirely avoidable. Given the fact that all of the parties are responsible for the losses and expenditures here, it is the view of this Court that all parties should share in the fault—granted, however, certain parties are definitely more at fault than others. Therefore, the Court continues to believe that settlement is in the best interest of all parties involved.

Accordingly, **IT IS HEREBY ORDERED** that:

1.      Dorsey's amended objections to the Report and Recommendation (Civil No. 06-3962; Doc. No. 7) are **SUSTAINED IN PART AND OVERRULED IN PART**.

2.      The Report and Recommendation dated August 28, 2006 (amended August 30, 2006) (Doc. No. 1) is **ACCEPTED IN PART AND REJECTED IN PART,** and the conclusions therein are **ADOPTED TO THE EXTENT THEY ARE NOT INCONSISTENT WITH THIS OPINION AND MODIFIED AS EXPLAINED HEREIN**.

3.      Dorsey's Appeal (Civil No. 06-4296; Doc. No. 1) is **DENIED**.

4.      The Bankruptcy Court's Order of August 28, 2006 (amended August 30,

---

(Footnote Continued From Previous Page)
injured even if no actual loss results." *Perl v. St. Paul Fire & Marine Ins. Co.,* 345 N.W.2d 209, 212 (Minn. 1984).

2006) (Doc. No. 1) is **AFFIRMED IN PART AS MODIFIED AND REVERSED IN PART**.

     5.     Civil No. 06-4297 is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  April 6, 2007          s/Donovan W. Frank
                                       DONOVAN W. FRANK
                                       Judge of United States District Court